# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39972**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Jonathon S. SOLOMON**
Captain (O-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 19 August 2022

————————————

*Military Judge*: Willie J. Babor (arraignment); Michael W. Grant (trial); Andrew R. Norton (post-trial).

*Sentence*: Sentence adjudged 8 November 2019 by GCM convened at Spangdahlem Air Base, Germany. Sentence entered by military judge on 24 August 2020: Dismissal, confinement for 9 years, forfeiture of all pay and allowances, and a reprimand.

*For Appellant:* Major Matthew L. Blyth, USAF.

*For Appellee*: Lieutenant Colonel Matthew J. Neil, USAF; Major Morgan R. Christie, USAF; Major Abbigayle C. Hunter, USAF; Major John P. Patera, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and CADOTTE, *Appellate Military Judges.*

Judge RICHARDSON delivered the opinion of the court, in which Senior Judge POSCH and Judge CADOTTE joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

RICHARDSON, Judge:

A general court-martial comprised of officer members convicted Appellant, contrary to his pleas, of nine specifications of abusive sexual contact in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1,2] The court-martial sentenced Appellant to a dismissal, nine years of confinement, forfeiture of all pay and allowances, and a reprimand. The convening authority deferred all forfeitures until entry of judgment, then suspended the adjudged forfeitures for six months while waiving the automatic forfeitures for the same period.[3]

Appellant raises 11 assignments of error[4] asking us to consider whether: (1) his convictions are factually and legally sufficient; (2) the military judge erred by failing to instruct the members on the charged term "medically necessary;" (3) the specifications fail to state an offense because the concept of "medical necessity" does not create a cognizable legal standard for guilt; (4) the military judge unconstitutionally relieved the Government of its burden to prove Appellant's representations regarding the professional purpose were untrue; (5) the military judge abused his discretion in allowing an expert witness (Major (Maj) BC) to testify outside the scope of his expertise; (6) the military judge abused his discretion by allowing an expert witness (Dr. MC) to link Appellant's case to the "Milgram Experiment;" (7) trial counsel engaged in improper findings argument; (8) the military judge abused his discretion by allowing trial counsel to deliver the unsworn statements of three victims, and by allowing two special victims' counsel to deliver unsworn victim statements; (9) Appellant's sentence is inappropriately severe; (10) the military judge abused

---

[1] All offenses at issue in this case were alleged to have been committed between 10 August 2015 and 12 June 2017, and were referred to court-martial after 1 January 2019. Elements of the offenses are not listed in the *Manual for Courts-Martial, United States* (2012 ed.) (2012 *MCM*), but are outlined in the *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*); Appellant was on notice as to both editions. Unless otherwise noted, all references in this opinion to the non-punitive articles of the UCMJ, Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM*).

[2] After resting its case in chief, the Government withdrew and dismissed with prejudice one other specification of abusive sexual contact. Appellant was found not guilty of two other specifications of abusive sexual contact.

[3] The convening authority did not specifically approve Appellant's entire sentence. On appeal, Appellant identifies this error but asserts no prejudice, and we find none. *See generally United States v. Brubaker-Escobar*, 81 M.J. 471 (C.A.A.F. 2021) (per curiam).

[4] Appellant personally raises the part of issue (1) claiming the specification involving DR was legally insufficient, and personally raises issues (3), (4), and (11). *See United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

his discretion by denying a defense motion for a new trial at a post-trial hearing; and (11) the Government cannot prove beyond a reasonable doubt that the military judge's failure to instruct the members that a guilty verdict must be unanimous was harmless.[5] In addition, the court considers the issue of timely post-trial processing and appellate review. We have carefully considered issue (11) and determine no discussion or relief is warranted. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987); *see also United States v. Anderson*, No. ACM 39969, 2022 CCA LEXIS 181, at *50–57 (A.F. Ct. Crim. App. 25 Mar. 2022) (unpub. op.) (finding unanimous court-martial verdicts not required), *rev. granted*, No. 22-0193, ___ M.J. ___, 2022 CAAF LEXIS 529 (C.A.A.F. 25 Jul. 2022).

## I. BACKGROUND

Appellant was a physician assistant, assigned to the Family Health section of the medical clinic at Spangdahlem Air Base (AB), Germany ("Clinic"). Each of Appellant's nine convictions for abusive sexual contact corresponds to an encounter he had with a female patient. The first of these encounters was on 5 December 2016 and the last was on 31 May 2017.[6] The last of these patients (CS) reported Appellant's conduct to law enforcement about two days after the encounter.

The evidence showed that each victim was first seen by a technician who checked her vital signs, asked questions pertaining to the visit, and recorded the results and responses in the patient's record. Generally, chaperones are provided for appointments that require the patient to expose private areas of their bodies, and also are provided upon a patient or provider's request. Based on the information gathered, the technician did not arrange for a chaperone to be present when each victim was seen by Appellant. After the technician left, no chaperone was present during the encounter and Appellant did not ask his patient if she wanted a chaperone. Appellant did not wear gloves when he touched each victim.

During trial on the merits, both parties called witnesses, introduced documentary evidence, and extensively cross-examined witnesses. The Government's case included testimony from the following: each named victim; Clinic technicians (MM and TM); one of Appellant's former flight commanders at the

---

[5] On 29 April 2022, we granted Appellant's motion for leave to file issue (11) as a supplemental assignment of error. Beyond its opposition to Appellant's motion, this court did not provide the Government an opportunity to respond to issue (11).

[6] The charged timeframe correlated to the period Appellant was assigned to the Clinic. The evidence admitted at trial indicates the actual time period during which Appellant committed the offenses.

Clinic, who also testified as an expert in the field of family medicine (Maj BC); an expert in obstetrics and gynecology (OBGYN) (Dr. DT); and an instructor from a program Appellant attended to become a physician assistant (Colonel (Col) KK). During the testimony of each named victim, the Government had her draw on a figure of a woman to indicate where on her body Appellant had touched her. The Government introduced the patient medical records relating to each allegation, photos of the Clinic, and records describing Appellant's performance as a healthcare provider.

The Government also presented testimony from an agent from the Air Force Office of Special Investigations (AFOSI) regarding an interview agents conducted with Appellant.[7] The Government entered a portion of this recorded interview into evidence, which contained the following exchange regarding Appellant's knowledge and use of chaperones:[8]

> [Special Agent]: So I know we had mentioned sexual assault. So does anything come to mind, when -- ?
>
> [Appellant]: Nothing. I mean, I do a lot of female exams and - you know - but I always have - you know - a chaperone in there - you know. Some of those females that have - like - lower pain - or you know - around, like, just below the belt line, I'll feel down there without a chaperone, but that's kind of common. Nothing - I mean, nothing, nothing comes to mind right now.

The Defense's case included testimony from another former flight commander at the Clinic (Maj VG), and a family practice care provider (Captain (Capt) DL) who attended a physician assistant training program with Appellant and later worked with him at the Clinic. The Defense also presented testimony from experts in the fields of internal medicine, cardiology, and AHLTA[9] (Col ML); OBGYN (Dr. CS); and "physician assistant specialized in family medicine and orthopedics" (Lieutenant Colonel (Lt Col) SG).

Appellant was convicted of nine specifications of abusive sexual contact against eight victims. Following, in chronological order beginning with the earliest offense, is a summary of the testimony from each victim supporting the convictions.

---

[7] This interview related to a specification of which Appellant was acquitted, and took place before the conduct of which Appellant was convicted.

[8] We transcribe the language from the prosecution exhibit, which differs slightly from the trial transcript.

[9] Testimony described AHLTA as an electronic medical record system used in the Air Force.

## A. BJ

BJ was assigned to Spangdahlem AB. She made an appointment with the Clinic to get a "release to fly" to Oklahoma while pregnant. At the encounter with Appellant on 5 December 2016, she said she was feeling fine. After checking her eyes, ears, reflexes, and lymph nodes on her neck, Appellant asked her to lay back on the table, saying he needed to examine her breasts. She complied. Appellant "reached his hand in through the top of [her] shirt and began feeling [her] breasts" under her shirt and bra. Appellant touched her breasts in a "random" circular direction, with a "tapping/massage motion." As he touched BJ, Appellant's "hands were shaky. They were cold and clammy. He would not make eye contact and he would not speak."

## B. RH

RH was married to an Airman stationed at Spangdahlem AB. She made an appointment at the Clinic because of shortness of breath. Appellant placed his hand and the stethoscope down the front of her shirt, then on her back on the outside of her shirt. RH told Appellant she felt a pain like an "internal bruise" in her chest area. Appellant asked her to remove her shirt, and she did. Appellant pushed on her chest with his fingertips and asked if she felt pain. She responded yes at first, then no to the other touches, which were "in a circular motion around [her] breast on either side." In RH's telling, "When he got back to the center he asked [her] if [she] could pull [her] straps down on [her] bra, and then he continued the pattern." Each time Appellant touched her breasts, she responded she felt no pain. When Appellant touched toward the bottom on her breast, he asked if she could take her bra off. Instead, she flipped the bra down, but did not take it off. Appellant continued the pattern of touching RH's breasts in a circular pattern. While Appellant was touching her breasts, Appellant was breathing heavily; she "had never noticed him breathing like that before" in prior examinations. Appellant did not explain the results of his examination to RH. At the time of this encounter, she believed Appellant's action had a medical purpose. He told her to wear a sports bra for a few weeks. He went to the computer, then left the room.

RH made another appointment at the Clinic, this time because of groin pain.[10] She showed Appellant where she felt the pain, over her yoga pants at her "bikini line." Appellant asked her to pull her pants down a little bit; she did. Appellant pressed down and asked if she felt pain; she said she did. He then asked RH "if it would be easier for [her] to take [her] leg out of [her] pant leg," so she took one leg out; the other pant leg was above the knee. Standing

---

[10] This appointment was on 14 April 2017. Chronologically, Appellant's conduct during this encounter was the second-to-last offense of which Appellant was convicted.

between her legs, Appellant pressed in the same spot, asking if she felt pain; she said she did. Appellant then moved his hands "downward." He asked if she felt pain; she said she did not. RH testified that Appellant touched her a total of six times. At the fourth touch, RH said she felt no pain. After the fifth touch—also without pain—Appellant asked RH "if [she] can reach down and pull [her] panties to the side;" she did. She was wearing a menstrual pad, and moved her underwear such that part of her vagina was exposed. On the sixth and last touch, Appellant touched "[i]n the outside of [her] vaginal area, the lip area, the outer lip area." RH told Appellant she was uncomfortable, and he stopped. Appellant did not explain to RH why he touched her labia. In response to a member question, RH said Appellant sounded "nervous."[11]

**C. MR**

MR was stationed at Spangdahlem AB. After receiving care in an emergency room, she made a follow-up appointment at the Clinic. She brought an EKG printout with her; Appellant did not look at it. MR testified that Appellant once "tried to listen to [her] heartbeat through [her t-shirt] and he told [her] he could not hear it." He asked her to remove her shirt and bra. MR asked for a chaperone. Appellant then handed her a gown and left. When Appellant returned without a chaperone, MR did not ask again, explaining: "I don't know if he didn't hear me, or whatever, but he was a doctor, so I trusted that he had my best intentions in mind." Appellant placed the stethoscope on the gown, and said he could not hear through the gown. Appellant had her lay down. "[T]hen he had opened the gown to where [MR] was fully exposed from the waist up" and placed the stethoscope "[r]ight on [her] breast," with his other hand "cupping . . . the bottom of [her] breast." Appellant placed the stethoscope "on [her] breast six times, and once on [her] nipple." During the three touches on the bottom part of her breast, "he would grab [her] breast" and move it with "a soft jiggle," "and then he would remove his hand and place the stethoscope" on her breast. Appellant did not examine her other breast. MR believed at the time of this encounter that Appellant touched her breast for a valid medical reason.

Appellant went to his computer, then asked whether she experienced any tingling, numbness, or cold feeling in her feet; she replied that she did not. Appellant asked her to take off her sock and boot. He then massaged her foot for what felt to MR like two minutes. He went back to his computer, then left the room. MR explained, "I had gotten dressed and I had waited about 10

---

[11] The question was, "When [Appellant] was touching your labia, can you describe what you recall hearing pertaining to [Appellant's] demeanor, how he sounded, and what you heard concerning [Appellant] sounding serious, calm, nervous, confused, curious, or otherwise?"

minutes, and then no one had come in the room, so I had left." Appellant did not tell MR his findings based on his examinations.

## D. SC

SC was a German national married to an Airman stationed at Spangdahlem AB. She made an appointment at the Clinic to get a referral to her off-base provider to refill her birth-control prescription. Appellant found a substitute medication, and SC agreed to get that medication instead of a referral. Appellant asked her to get on the table for an examination, and told her he wanted to check her heart rate. At the time, SC was wearing jeans, an outer blouse, a tank top, and a bra. Appellant struggled with getting his hand and stethoscope down the front of her blouse, so SC asked if she should remove her blouse, to which he replied, "If [you] don't mind." She removed her blouse, leaving on her tank top. Appellant "went further down with the telescope, in-between [her] breasts . . . moving it around for a while, and he was saying, 'I cannot find your heartbeat.'" SC then offered to remove her tank top, and did, leaving on her bra. SC testified that Appellant "was still with the stethoscope in-between [her] breasts for some time, and then he went with the stethoscope on [her] right-hand side, down on [her] body." Appellant repeatedly told SC to take deep breaths.

Appellant moved the stethoscope down to SC's lower groin, then asked SC to unbutton and unzip her jeans. He told her he was going to check her pulse. He placed the stethoscope under her underwear, getting to "a finger-width away from [her] vagina." She felt the cold metal of the stethoscope. In response to a question from counsel, SC agreed that "when his hand and the stethoscope were down there," Appellant touched her pubic hair. After Appellant took the stethoscope out of her pants, he asked her about getting a pap smear, telling her that on military installations they check patients yearly. He left the room briefly, then returned and offered to perform a pap smear, but SC "was really uncomfortable by that point" and declined. During the encounter, Appellant never tried to check her pulse on her wrist or neck. Appellant did not explain the results of his examination to SC. SC believed at the time of this encounter that Appellant touched her groin for a medical reason.

## E. EP

EP was married to an Airman stationed at Spangdahlem AB. She made an appointment at the Clinic to obtain refills of medication prescribed by the provider she had seen during her recent pregnancy. She had seen Appellant before, including when Appellant ordered an MRI and referred her to an orthopedic specialist for pelvic pain. A chaperone was present for that prior exam. After they discussed the refills, EP told Appellant the results of the MRI of her pelvis. Appellant "asked [her] to lay on the exam table and pull [her] pants

down. And [she] pulled them down and he continued to do an exam, feeling on [her] pubic area." EP also pulled her underwear down. She did not lay down, but was reclined on her elbows. Appellant palpitated different places in her pelvic area with his fingers. At one point, EP "noticed that his fingers spread apart a little bit more, and was almost, like, coursing through [her] pubic hair." She testified she had noticed "it wasn't how he was palpitating the rest of [her] pelvis. It was definitely a difference." Appellant stopped, and placed his hand near his nose. EP described Appellant's next action with his hand as an "itch" or "wipe" of his nose, and said "[i]t sounded like he smelled his fingers." He did not explain to EP why he needed to examine her in that way. When she left, EP "felt things were not done how they should have been done," explaining that she did not anticipate she would undergo an exam. Also, she thought Appellant should have been wearing gloves. Sometime afterwards, she talked to her friend SC—the same SC described above—about the encounter.

**F. DB**

DB was married to an Airman stationed at Spangdahlem AB. She made an appointment at the Clinic as part of her enrollment in Tricare. Appellant listened to her heart with a stethoscope. DB asked Appellant whether she should remove her shirt so he could hear better.[12] Appellant agreed. Appellant went behind a curtain while DB removed her clothing; she could not remember whether she removed only her shirt at that point, or also her bra. When her upper body was fully unclothed Appellant "touch[ed] around the chest area, around the armpit" with his hands from the bottom of her breasts to the outer and upper sides. Appellant was standing directly in front of her, not to the side. The encounter ended with a discussion about making an appointment for a pap smear. DB was nervous because it was her first appointment at a military clinic and she "just didn't know exactly how everything goes when you go to the doctor."

**G. DR**

DR lived with her active-duty husband, who was stationed at Spangdahlem AB. She made an appointment at the Clinic for a prescription refill, but the morning of the appointment had a positive home-pregnancy test. She met with Appellant, who sent her to the lab to confirm. She went back to the Clinic and Appellant told her the lab results. He "asked [her] to lay back and slide [her]

---

[12] DB also thought Appellant might be conducting a breast examination, as DB had received breast implants about a year prior. However, she did not remember asking Appellant to check her breasts, and Appellant did not tell her he wanted to perform a breast examination.

pants down a little bit." She pulled her pants to about thigh-level, and was wearing thin thong-style underwear. DR explained,

> I remember him standing off to the right of me and reaching down in beside my underwear and in-between my thighs, and he didn't really say what he was doing until his hand was already there, to the right of my labia, and he was there and he was rubbing and all he said was, "In the coming months, you'll feel pain in this area."

DR felt two of Appellant's fingers touching her, and confirmed that he did touch her labia. At the time of this encounter, she thought Appellant was touching her for a medical reason, but mostly was thinking about her pregnancy results. In response to a member question, DR said that Appellant "sounded kind of nervous" based on "his breathing and mannerisms."

**H. CS**

CS was on active duty at the time of her appointment with Appellant on 31 May 2019. She made the appointment at the Clinic because she had "an extended cold." Appellant said he wanted to listen to her lungs. He listened, with a stethoscope to her back but over her t-shirt and sports bra, said he "couldn't get a good listen," and said he wanted to listen under her shirt. CS untucked her t-shirt, then Appellant put the stethoscope under her shirt. He said he thought he heard wheezing, and wanted to listen from the front. He moved the stethoscope "in a W shape across, underneath [her] breasts, to listen." At her sternum, "[h]e lifted [her] sports bra up with his other hand to slide his hand inside, between the breasts, to listen." Appellant touched her breasts with his hand, not just the stethoscope. Appellant did not tell her what he heard. He did not check her ears, nose, or throat, but did check the lymph nodes on her neck. CS had breast implants placed about seven months before this encounter.

Appellant went to the computer, then asked CS whether her cold was interfering with her upcoming abdominal surgery; she confirmed it was. Appellant then asked to look at her abdomen and "see [her] stomach, the damage." CS laid down, with the top two buttons of her uniform pants undone. Appellant put his hands on her abdomen, then below the belly button. Appellant "tiptoed his fingers down further into [her] pelvic area." When his fingers were "[b]asically touching" her pubic hair, CS stopped Appellant by falsely telling him "the damage did not go down that far." Appellant did not ask CS to cough, bear down, or do a sit up. CS had not complained of pain.

Appellant went back to his computer, and said he forgot to do a lymph node exam. He wanted to check the nodes under her armpit. She lifted her arms, then Appellant's "fingers, in a wavy motion, touch[ed] the side of [her] ribcage

and breasts." She "laugh[ed] and giggl[ed]," and apologized for being ticklish. Appellant "laughed and giggled too, and continued the exam." Appellant touched her "[o]n the side of the ribcage, all the way through to the side boob area" on both sides, then under the armpit.

By the end of the encounter, CS felt "[s]hocked, uncomfortable, violated, [and] unsure." She thought Appellant's examination of her pubic area was "very excessive, unnecessary," but Appellant acted like he was doing it for a medical reason. She texted her friend on the way to the pharmacy, saying: "Omg," "Something just happened at the doctors," and "I feel almost violated?" In the next days, she reported the incident to base law enforcement. A noncommissioned officer testified about what CS told him had happened, and about CS's positive character for truthfulness.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Additional Background

In the case under review, the Government's theory of guilt generally was that Appellant (1) identified potential victims—women with appointments for a reason that did not necessitate a chaperone, (2) touched the women initially with a stated medical purpose, (3) touched the women in sensitive or progressively more sensitive parts of their bodies, (4) did not get a chaperone, (5) did not perform the touching in a manner that correlated with any stated medical purpose, and (6) did not document the actual areas he touched in the women's medical records. The Government used facts supporting its theory to prove the elements of the offenses, including Appellant's intent to gratify his sexual desire.

#### 2. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence presented at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). The evidence supporting a conviction can

be direct or circumstantial. *See United States v. Long*, 81 M.J. 362, 368 (C.A.A.F. 2021) (citing Rule for Courts-Martial (R.C.M.) 918 (c)) (additional citation omitted). "[A] rational factfinder[ ] could use his 'experience with people and events in weighing the probabilities' to infer beyond a reasonable doubt" that an element was proven. *Id.* at 369 (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)). "The term reasonable doubt . . . does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "Court members may believe one portion of a witness's testimony but disbelieve others." *United States v. Bare*, 63 M.J. 707, 713 (A.F. Ct. Crim. App. 2006) (citing *United States v. Harris*, 8 M.J. 52, 59 (C.M.A. 1979)). The "standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (internal quotation marks and citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

The elements of the abusive sexual contact specifications of which Appellant was found guilty include the following: (1) Appellant committed sexual contact upon another person by touching a certain body part of that other person; (2) Appellant did so by making a fraudulent representation that the sexual contact served a professional purpose, to wit: that the sexual contact was medically necessary; and (3) Appellant did so with the intent to gratify his sexual desire.[13] *See, e.g.*, *Manual for Courts-Martial, United States* (2016 ed.), pt. IV, ¶¶ 45.b.(7)(c), 45.b.(8)(c).[14] The term "sexual contact" includes touching the body part of any person if done with the intent to gratify one's sexual desire. *See Manual for Courts-Martial, United States* (2012 ed.), pt. IV, ¶ 45.a.(g)(2).

---

[13] The specifications concerning BJ, MR, EP, DR, and CS alleged "an intent to arouse or gratify."

[14] As indicated in note 1, *supra*, elements of this offense are not listed in the 2012 *MCM*, but may be derived from reviewing the text of the UCMJ article. *See* 2012 *MCM*, pt. IV, ¶¶ 45.a(d), 45.a(b)(1)(C), 45.a(g)(2)(B).

"Touching may be accomplished by any part of the body." *Id.* The term "fraudulent representation" is not defined in the statute or the *Manual for Courts-Martial* dating back to 2012. The Military Judges' Benchbook contains a sample definition: "A 'fraudulent representation' is a representation of fact, which the accused knows to be untrue, which is intended to deceive, which does in fact deceive, and which causes the other person to engage in the sexual contact." *Military Judges' Benchbook*, Dept. of the Army Pamphlet 27-9 at 599 (10 Sep. 2014).

We review de novo whether a specification states an offense. *See United States v. Turner*, 79 M.J. 401, 404 (C.A.A.F. 2020) (citation omitted); *United States v. Schloff*, 74 M.J. 312, 313 (C.A.A.F. 2015). "[W]here defects in a specification are raised for the first time on appeal, dismissal of the affected charges or specifications will depend on whether there is plain error -- which, in most cases, will turn on the question of prejudice." *United States v. Humphries*, 71 M.J. 209, 213 (C.A.A.F. 2012) (footnote and citations omitted). "In the context of a plain error analysis of defective indictments, '[the] [a]ppellant has the burden of demonstrating that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused.'" *Id.* at 214 (alterations in original) (quoting *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011)) (additional citations omitted).

The standard for determining whether a specification states an offense is whether it alleged every element of the charged offense either "expressly or by necessary implication," so as to provide an accused both notice and protection against double jeopardy. *United States v. Dear*, 40 M.J. 196, 197 (C.M.A. 1994) (internal quotation marks and citations omitted). "This is a three-prong test requiring (1) the essential elements of the offense, (2) notice of the charge, and (3) protection against double jeopardy." *Id.*

When failure to state an offense is asserted for the first time on appeal, "the sufficiency of the specification may be sustained 'if the necessary facts appear in any form or by fair construction can be found within the terms of the specification.'" *United States v. Crafter*, 64 M.J. 209, 211 (C.A.A.F. 2006) (quoting *United States v. Mayo*, 12 M.J. 286, 288 (C.M.A. 1982)).

### 3. Analysis

We consider Appellant's claims as they relate to each element of the offense of abusive sexual contact.

#### a. Sexual contact

Appellant claims the Government did not sufficiently prove the element of sexual contact in Specifications 8, 7, and 5 regarding SC, DB, and, to an extent, BJ.

### i) SC

Appellant asserts SC's testimony does not support the allegation that Appellant touched her groin with his hand and not with the stethoscope he was holding in his hand. In her testimony, SC did not make a distinction between Appellant touching her with his hand and with the stethoscope. SC testified she could "feel only the metal," yet she also said Appellant touched her pubic hair. The Government argues that SC's testimony—including that Appellant reached down into the narrow space under SC's pants and underwear with his hand on a stethoscope, touched her groin until he got to within a finger-width of her vagina, and touched her pubic hair—is evidence that Appellant touched SC's groin with his hand. We agree that a rational factfinder could come to this same conclusion.[15]

### ii) DB

Appellant asserts DB's testimony does not support the allegation that Appellant touched her breast. Both parties agree that DB testified that Appellant touched her chest area and around her armpit. Appellant claims DB's drawing shows lines that "do not overlap with her breasts." The Government suggests that same drawing "shows Appellant touched the side of her breast and up into her armpit." Moreover, the Government asserts other testimony supports the conclusion that the breast extends to the armpit. DB's testimony that Appellant first touched her chest in order to hear her heartbeat, then examined her breasts, lends support to the interpretation that Appellant touched at least one of DB's breasts, albeit perhaps only the outer contours.

### iii) BJ

Regarding BJ, Appellant does not claim the act that BJ described was not a sexual contact. Instead, he asserts her "confusion and credibility issues prevented the Government from meeting its burden to prove [Appellant's] guilt beyond a reasonable doubt" and claims "nothing that [BJ] said can leave this [c]ourt with any confidence of what occurred in that room." The Government responds that BJ's "memory of what happened at the appointment was clear and credible." Having considered BJ's testimony as a whole, we are convinced a rational factfinder could believe BJ's description of Appellant touching her breasts with his hand under her shirt and bra.

---

[15] We note that sexual contact may be accomplished using a stethoscope and not the hand directly, but it was not charged in this manner in this case. *See United States v. Schloff*, 74 M.J. 312, 314 (C.A.A.F. 2015).

### b. Fraudulent representation

As described above, the second element of each offense is that Appellant made a sexual contact by making a fraudulent representation that the sexual contact served a professional purpose, to wit: that the sexual contact was medically necessary. The military judge provided the court members a definition of "fraudulent representation," which Appellant does not claim—nor do we find—was erroneous:

> A fraudulent representation is a representation of fact, which the accused knows to be untrue, which is intended to deceive, which does in fact deceive, and which causes the other person to engage in the sexual contact. The fraudulent representation that the sexual contact served a professional purpose need not have been made by the accused to the alleged victims. It is sufficient if the accused made such a fraudulent representation to any person, which thereby caused an alleged victim to engage in the sexual contact.

> A fraudulent representation that a touching is for a professional purpose need not be solely expressed in words. In determining whether a fraudulent representation was made, you may consider the totality of the accused's conduct and not just his verbal statements. A false representation may be inferred from conduct, or a combination of words and conduct.

> A patient's confusion or doubt about the purpose of the touching does not preclude a conviction as long as you find beyond a reasonable doubt that the patient allowed the touching to occur because of the accused's fraudulent representation of a professional purpose.

The military judge also instructed the members that the "term 'to wit' means 'namely' or 'that is to say.'"

Appellant asserts that, for each specification, the evidence failed to sufficiently prove that he made a fraudulent representation that the contact was medically necessary. As his counsel argued at trial, Appellant asserts on appeal that if his contact served *any* professional purpose, i.e., it was "within the scope of normal medical practice" or "rested on solid medical reasoning," it was medically necessary and thus not a fraudulent representation. The Government counters, as it did at trial, that Appellant had no medical reason to conduct the purported exams and did not properly conduct those exams, and therefore they were not medically necessary.

Whether Appellant's contacts served any professional purpose—or were within the scope of medical practice, or rested on solid medical reasoning—is

not inconsistent with a fraudulent representation. Appellant's sexual contacts had a root in medical care, which is how he had the opportunity and ability to deceive his victims. He represented to each victim that he needed to touch them for a medical purpose, and for that reason, they allowed him. However, circumstantial evidence—including how Appellant touched each victim, how physician assistants should conduct exams, Appellant's failure to arrange for the presence of a chaperone before touching sensitive areas, Appellant's lack of feedback to the victim about the exam, and the lack of medical documentation of the exam—was proof that Appellant knew he did not need to touch the victim's private areas in the manner he did, but through his words or actions falsely represented that he did. The element of fraudulent representation was met because Appellant caused each victim to believe the purpose of the sexual contact was professional medical care, when Appellant knew[16] the purpose of the contact was something else—in this case, an intent to gratify his sexual desire.

### c. Intent

Intent may be proved by circumstantial evidence. *See King*, 78 M.J. at 221. "[T]he ability to rely on circumstantial evidence is especially important in cases . . . where the offense is normally committed in private." *Id.*

Appellant asserts the facts do not support the third element of all the specifications: an intent to arouse his sexual desire. The parties' arguments regarding CS are illustrative. Appellant asserts that "[t]he manner of the touching, repeatedly passing a stethoscope below the breasts, does not support an intent to arouse or gratify his sexual desire" and "the Government's proof relies on vague critiques of technique to substitute for evidence of [Appellant's] intent." The Government asserts "[t]he places on [CS]'s body that Appellant touched," along with "[t]he lack of a medical reason to conduct the touching of [CS], and Appellant's uncharacteristic failure to follow the chaperone policy, document his exams, and explain the results of his exam to [CS] all sufficiently prove Appellant's intent was to gratify his sexual desires."

The Government proved intent in this case with circumstantial evidence. The Government presented evidence of the technique Appellant used to touch his patients. One example is testimony from RH that Appellant stood between her legs and asked her to move her underwear to the side. Expert testimony

---

[16] After discussion with the parties beforehand, the military judge provided the members an instruction that mistake was a defense to Specifications 1–11, stating, in part, "[i]f the accused at the time of an offense was under the mistaken belief that the sexual contact served a professional purpose, to wit: that the sexual contact was medically necessary, then he cannot be found guilty of abusive sexual contact."

explained why medical providers are trained to stand on the outside of the patient's legs to examine the groin, and opined that in this case moving the underwear was not necessary.

Some of the evidence went beyond the technique Appellant employed to make the charged contact, for example: sniffing his fingers after touching a victim's pelvis and pubic hair (EP), rubbing a victim's foot without explanation (MR), and demonstrating on a victim where she would feel pain due to pregnancy by touching her labia (DR). Most of the evidence supporting intent did not consist of a single fact and instead was comprised of a constellation of facts. For example, the Government argues on appeal:

> Appellant is a competent provider who would have known a medical exam was not necessary for a birth control refill, would have been able to hear [SC]'s heartbeat on her chest, would have known there are multiple other benign body locations to check[ ] for pulse, and, if he had truly been taking the femoral pulse, would have done it correctly. Appellant's intent in touching [SC] was to gratify his sexual desires, and the evidence proves it.

Another example is BJ, who testified that Appellant tapped or massaged her breasts in a "random" direction with cold, clammy, shaky hands and without speaking.

The Government even presented evidence that the breast was a sexual organ. Dr. DT testified that from a medical viewpoint, the breast is not a sexual reproductive organ, "[b]ut in society it's a sexual organ." Dr. DT further explained that his "patients are not physicians, and so [he] treat[s] it as a sexual organ" and utilizes chaperones for breast exams.

Additionally, the Government relied on evidence introduced under Mil. R. Evid. 404(b) of Appellant not following the chaperone policy and not adequately documenting the patient encounters,[17] in order to show Appellant had the plan or design, and created the opportunity, to be alone with his victims and commit sexual contacts that gratified his sexual desire, and then cover up his crimes. An example is DB, who came to see Appellant for a physical for which no chaperone was anticipated. Appellant had her remove her shirt and bra and examined her breast implants, but did not document this breast exam in her patient records. BJ's experience was similar. The Government's cross-examination of

---

[17] A court member posed a written question asking whether "the deliberate failure to document a physical exam [is] considered falsification of an official record." Both parties objected, and the military judge did not ask the question. However, this later prompted the Government to request and—without objection from the Defense—the military judge to add this failure to document to the Mil. R. Evid. 404(b) instruction.

one of Appellant's friends and peers from physician assistant training, Capt DL, emphasizes many of these points:

> Q. Okay. When you're listening to a woman for chest or lung sounds, have you ever gotten to the point where you'd ask a woman to take off both her shirt and her bra just so you could try to hear her lungs?
>
> A. If the wire were in the way, sure, I might ask them to take off both their bra and their shirt, and I would have them get into a gown.
>
> Q. And you'd get a chaperone?
>
> A. Yes, I would.
>
> Q. And you'd step out of the room?
>
> A. I would step out of the room while they were - while they were undressing, yes.
>
> Q. And you would explain to them why they're getting a gown on?
>
> A. Yes. And once again, this would be in a situation where I thought it was necessary because they had a primary pulmonary complaint.
>
> Q. And as part of your training in either phase one or phase two, were you ever trained to listen for lung or heart sounds directly over the nipple?
>
> A. I don't believe that I would do that, no.
>
> Q. And that's because fat tissue interferes with sound coming through?
>
> A. Yes, it attenuates sound.
>
> Q. And you weren't trained to listen over the sternum either, were you?
>
> A. Just to the lateral aspect of the sternum - the sternal border, but not - no, not directly over the sternal bone, no.

Regarding documentation, Capt DL answered in the affirmative the member question:

> In the context of your experience as a [physician assistant] at Spangdahlem, if you thought a patient could be at risk of an undiagnosed congenital heart disorder, or sudden cardiac death, would you make any particular effort to document the exams you

17

did based on those potential conditions, even on a very busy day,
and even if AHLTA was down?

To be sure, some people would not expect a medical provider to get sexual gratification from touching many of these patients the way Appellant did. Indeed, the members could have used their "experience with people and events," *see Long*, 81 M.J. at 369, and rejected the inference that Appellant had the requisite sexual intent when he touched a patient.[18] However, the tests for legal and factual sufficiency do not center on any other person's subjective notions of what is sexually gratifying. A rational trier of fact could find beyond a reasonable doubt that *Appellant* had an intent to gratify his sexual desire when he touched his patients in the manner the patients described. Moreover, we are personally convinced by the evidence supporting the element of intent for each specification of which Appellant was found guilty.

### d. Failure to state an offense

Appellant personally claims that "the amorphous concept of 'medical necessity' does not create a cognizable legal standard for guilt." He asserts that the "addition of the phrase 'to wit: that the sexual contact was medically necessary' rendered the charges fundamentally flawed such that they cannot support the conviction." The Government asserts Appellant forfeited this issue by not moving to dismiss for failure to state an offense; the issue does not amount to plain error; and no substantial right of Appellant was prejudiced.

At the outset, we note Appellant does not assert that he lacked notice or lacked protection from double jeopardy as a result of the Government's charging scheme. *See Crafter*, 64 M.J. at 211. We understand Appellant's argument to be that the phrase "medically necessary" has no medical meaning, yet at trial was likened to "standard of care," and resulted in a conviction based on a negligence standard. While the meaning of the phrase "medically necessary" was the topic of much discussion among the parties and the military judge at the trial, none of that discussion involved failure to state an offense. Accordingly, this issue is forfeited and we review for plain error. *Humphries*, 71 M.J. at 213.

The addition of the phrase "medically necessary" did not change the remainder of the specifications alleging all elements of the crime of abusive sexual contact. It modified the element of fraudulent representation; it narrowed

---

[18] During closing argument, trial defense counsel asked the members to do just this, rhetorically asking them, "He's going to run his fingers through the pubic hair of a 285-pound woman for sexual gratification, like, that just doesn't make sense. Who is 6 months post-partum? No."

the professional purpose to a medical one, and not some other professional purpose like educational.[19] Even if we were to find error by the inclusion of the phrase "medically necessary" in the specifications, we would find no prejudice; Appellant has not convinced us that he was convicted based on a negligence standard or anything less than proof beyond a reasonable doubt. *See* Section E, *infra.* The evidence relating to standard of care was not used to show that Appellant provided substandard or negligent medical care—that is, simply was wrong about whether the examination was medically necessary—and was thus guilty of abusive sexual contact by a negligence standard. Instead, the Government used that evidence to show that Appellant was a competent provider who knew what exams were medically indicated and how to perform them, and was *not*, in fact, conducting what he thought were medically necessary exams.

We conclude that a rational factfinder could have found beyond a reasonable doubt all the essential elements of Appellant's convicted offenses. Furthermore, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's convictions both legally and factually sufficient.

## B. Instructions on the Elements and Definitions of the Offenses

Appellant asserts two errors related to the military judge's instructions on findings. First, he claims the military judge erred by failing to instruct the members on the charged term "medically necessary." He also claims the military judge unconstitutionally relieved the Government of its burden to prove Appellant's representations regarding the professional purpose were untrue.[20] We find the former claim waived and consider the merits of the latter.

### 1. Additional Background

The specifications of which Appellant was convicted allege a sexual contact with an intent to gratify his sexual desire, "by making a fraudulent representation that the sexual contact served a professional purpose, to wit: that the sexual contact was medically necessary."

Before opening statements, the military judge held an Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing for trial defense counsel "to present argument on a

---

[19] The sample specification in the *Manual* guides practitioners to describe the professional purpose at the heart of the fraudulent representation, starting with the words, "to wit." *See* 2016 *MCM*, pt. IV, ¶ 45.f.(7)(c).

[20] Appellant claims a due process violation, but does not articulate how prejudice resulted: "In essence, by relieving the Government of having to prove that no professional purpose existed, the Government no longer had to prove the representation was fraudulent." We consider Appellant's issue as an error in instruction.

concern they have in regards to the way the Government has charged the case and/or potentially what the elements of the offense will be." Circuit defense counsel (CDC) argued:

> In taking a look at the Benchbook, it does have a definition as to what a fraudulent representation is, but it doesn't have a definition as to what a professional purpose is. The Defense's perspective on this is that by adding this "to wit" language, the Government has added to what it is that they have to prove, not reduced what it is they have to prove. So in terms of looking at the Benchbook as to what the second element is, which is that a fraud - the accused made a fraudulent representation that a sexual contact served a professional purpose.

> If you look at it one way, that the "to wit" language modifies fraudulent representation, or if you look at it a different way, the "to wit" modifies "professional purpose," or the "to wit" modifies both. The "to wit," in the Defense's position, can't modify the professional purpose to lessen what it is the Government has to prove. In effect, the Government has to prove that there was a - sort of stating it in the converse, the Government has to prove that, beyond a reasonable doubt, that a fraudulent representation was made, and that it did not actually serve a professional purpose.

> Because if you look at the definition of what a fraudulent representation is, it says - it sort of breaks it into five parts, one of which is that the accused knew - or, a statement - the representation the accused knew to be untrue. So kind of reading those in conjunction, the Defense's position is that that means *the Government has to prove beyond a reasonable doubt that it did not serve a professional purpose.* That the Government can't go so far as to use the "to wit" language to narrow what professional purpose means, to only mean "medically necessary."

(Emphasis added).

The circuit trial counsel (CTC) countered that "to wit" means "namely," and that language simply identifies "how [Appellant] went about the *actus reus* of going about perpetuating the fraud." He argued that inclusion of that language on the charge sheet did not place on the Government the burden "to disprove all potential other reasons why [Appellant] could be taking that action," or, put another way, "to prove beyond a reasonable doubt that there was zero [ ] professional purpose for this."

The military judge provided the parties his ruling on what the elements of the offenses were. Regarding the wording at issue, he stated:

> Furthermore, I find that based on the above, the Government has not limited the scope of the term "professional purpose" nor have they increased the elements necessary to prove the offense charged.

> Lastly, I find that the Defense has failed to demonstrate based on the law that the Government must disprove beyond a reasonable doubt that there was no possible professional purpose for the exam. I find that the elements require that the Government prove beyond a reasonable doubt, among other things, that the accused committed the sexual contact by making a fraudulent representation that the sexual contact served a professional purpose, namely in this case that it was medically necessary.

The military judge further clarified that, in order to have a fraudulent representation, Appellant must have the intent to make the contact not because it was medically necessary, but to gratify his sexual desires. Conducting a medically necessary exam would not result in a fraudulent representation. Conducting an exam that was not medically necessary, in order to gratify his sexual desires, would meet the elements. "My ruling is that the Government has to prove that that abusive sexual contact took place by the accused [who] made a fraudulent representation that that touching itself was necessary." The military judge summarized as follows:

> [Military Judge (MJ)]: Did he fraudulently misrepresent to that person that he needed to touch her in a way in order that it was medically necessary to conduct the exam or do his medical duties. That's the issue. So I think both parties agree exactly what you just said, [CDC], which is if there is evidence that comes out, the fact-finder finds - can find that if there is evidence that the accused had a medical purpose for touching and engaging in those actual - the *actus reus* - the actual acts, then he can't have fraudulently [represented]. We don't even get to the intent of his sexual - gratifying his sexual desire if we can't show the fraudulent representation. Do we agree?

> CTC: We agree, sir.

> MJ: Counsel, that's what you wanted us to agree on, right?

> CDC: Yes, Your Honor.

MJ: Okay. Counsel, I'm hoping that we're all on the same page, but if this comes up and becomes an issue, we'll take it up on the record and we'll deal with it. . . .

. . . .

MJ: [W]hen I say medical purpose and medically necessary, I think we've discussed that enough now on the record why I said those are synonymous. Because in order for it to be medically necessary, there has to be a medical purpose. And I am assuming that if there is a medical purpose, then it's medically necessary for him to do it. But I don't think that's the crux of any argument now that we've fleshed this out. I think we're all on the same page on that, right?

CDC: And I anticipate that we will likely - the Defense will be providing testimony as to what exactly is medically necessary as a medical purpose, things of that nature.

MJ: That's what I've anticipated all along. It makes sense to me.

At the beginning of his opening statement, the trial defense counsel stated:

What you're going to hear is several women who had uncomfortable interactions with [Appellant]. What you will not hear is that these contacts served any sexual purpose. To the contrary, the evidence will show that each of these contacts had a valid medical purpose, that [Appellant] did not have a sexual intent when he touched these women. That's the evidence you will hear today.

The military judge provided several opportunities for counsel to bring up issues relating to the findings instructions he would give. One opportunity was right before they recessed for the evening—the day before the members would be provided findings instructions. The military judge again asked the parties, "[L]ook at the drafts that you submitted to me. Look at the draft that I provided to you."

The Government proposed draft instructions on findings, which the military judge addressed with the parties the next morning. The military judge held a lengthy discussion with the parties—primarily the Government—about whether to instruct on accident or mistake. In the section on mistake, the Government proposed how the military judge should instruct with regard to the charged "professional purpose, to wit: that the sexual contact was medically necessary." The Government's proposed instructions included the following paragraph:

> The requirement for medical necessity is a part of the specification that is unnecessary to and independent from the allegation of the offenses proved and, as such, it may be treated as "a useless averment" that "may be ignored." The [P]rosecution need only prove that the accused intended to falsely represent or acted with reckless disregard as to his representation that the touching was for a professional purpose.

Defense counsel reviewed the language, and responded,

> We would object to that. We think that it would be appropriate to give a definition of medical necessity. But based on Your Honor's previous ruling on this subject - this is a matter that we took up early on before the members got here about - you know - how many elements there are and what are the definitions of the elements, and what Your Honor said was that - you know - medical necessity and medical purpose are synonymous. So the defense's position would be that giving a simple definition of, okay, medical necessity –
>
> MJ: Let's be - real quick, when I - for purposes of the motion in the way I was explaining things, I was explaining medical purpose and medical necessity as one term for my explanation of my ruling. We've had this now discussion a couple times. I did not rule at any time in this court-martial that there's a legal definition for medical necessity or medical purpose. So just - I want to make that clear. So you're saying that you would be amenable to a definition of medical necessity, but you don't believe - could you just kind of focus in on what - the instruction they're asking for?
>
> . . . .
>
> [Defense Counsel (DC)]: Yes, Your Honor. We would object to this. The Government basically added language to the charge and said this is how the accused allegedly said that it was - served a professional purpose, to wit: that it served - it was medically necessary. Now they're saying, "Well, that language that we added in there to explain to you what this alleged medical purpose was is useless and you should just disregard it." . . .

Neither the Government nor the Defense proposed a *definition* of "medical necessity." The military judge ruled he would not instruct the members to disregard the charged language of "medical necessity," as the Government proposed. Ultimately, he did provide standard instructions on accident and mistake.

Concluding their discussion about findings instructions, the military judge asked trial defense counsel as follows:

> MJ: Defense, are there any instructions that you requested at any time during this trial that you want in here that I didn't give you?
>
> DC: No, Your Honor.
>
> MJ: All right, so you're happy with these instructions?
>
> DC: Yes, Your Honor.
>
> MJ: And they're legally correct?
>
> DC: Yes, Your Honor.

After the military judge read his findings instructions to the court members, he asked counsel for both sides whether they "object[ed] to the instructions given or request[ed] additional instructions," to which both replied, "No, Your Honor."

**2. Law**

Whether the military judge correctly instructed the court members is a question of law we review de novo. *United States v. Payne*, 73 M.J. 19, 22 (C.A.A.F. 2014) (citation omitted).

Military judges are required to "determine and deliver appropriate instructions." *United States v. Barnett*, 71 M.J. 248, 249 (C.A.A.F. 2012) (quoting *United States v. Ober*, 66 M.J. 393, 405 (C.A.A.F. 2008)). Required instructions include, *inter alia*, a "description of the elements of each offense charged," any applicable special defenses, and "[s]uch other explanations, descriptions, or directions as may be necessary and which are properly requested by a party or which the military judge determines, *sua sponte*, should be given." R.C.M. 920(e). Not all words in a specification require definition, even when they are essential to an element of the offense. *See United States v. Bailey*, 77 M.J. 11, 15 (C.A.A.F. 2017) (noting that words "generally known and in universal use" do not require judicial definition) (quoting *United States v. Nelson*, 53 M.J. 319, 321 (C.A.A.F. 2000)).

When counsel discuss a potential instruction with the military judge, but do not propose language, object to other proposals, or affirmatively request a particular instruction, they have waived the issue. *See United States v. Rich*, 79 M.J. 472, 477 (C.A.A.F. 2020). "Whether an appellant has waived an issue is a legal question we review de novo." *United States v. Schmidt*, 82 M.J. 68, 72 (C.A.A.F. 2022) (citation omitted).

The Courts of Criminal Appeals (CCA) have the unique authority to address errors raised for the first time on appeal despite waiver of those errors

at trial. *See, e.g.*, *United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018); Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1) (charging the CCAs to affirm only so much of the findings and sentence that they find is correct and "should be approved"). CCAs assess the entire record and determine "whether to leave an accused's waiver intact, or to correct the error." *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016).

"Failure to object to an instruction or to omission of an instruction before the members close to deliberate forfeits the objection." R.C.M. 920(f). We review forfeited issues for plain error. *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020) (citation omitted). In a plain error analysis, the appellant "has the burden of demonstrating that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused." *Girouard*, 70 M.J. at 11 (citation omitted).

**3. Analysis**

We find Appellant waived the issue of the military judge providing the court members a definition of "medically necessary." We disagree with Appellant's statements on appeal that the defense counsel "was specific in stating that the military judge should instruct on the definition of medical necessity" and "[t]hey would have every reason to believe the final version would include a definition for medical necessity." We find the Defense did not specifically request such an instruction, nor did it propose a specific instruction or object to the military judge's instructions.

In the context of an instruction on *mistake*, the Defense objected to the Government's suggestion that "medical necessity" "may be ignored." It did not object to the *idea* of providing a definition of "medical necessity," and even suggested "it would be appropriate," but it neither proposed language to the military judge nor requested the military judge craft a definition.[21] The Defense did not request any additional instructions to those the military judge gave, which did not include a definition of medically necessary. If the Defense expected to hear and read a definition of medically necessary from the military judge, it had the opportunity to raise the issue with the military judge before the members began their deliberations. It did not, and so waived the issue. We have reviewed the entire record, and have determined to leave intact Appellant's waiver of error relating to a definition of medically necessary.

We next consider Appellant's claim of improper burden shifting. The military judge provided a lengthy ruling on his interpretation of the elements the

---

[21] In his analysis of this assignment of error, Appellant appears to propose a definition, as he finds "reasonable medical care" synonymous with "medical necessity."

Government would have to prove beyond a reasonable doubt for Appellant to be found guilty. Included in his ruling were these statements:

> I find that the Government has to prove beyond a reasonable doubt that the accused committed sexual contact upon the named individuals, that he did so by making a fraudulent representation that the sexual contact served a professional purpose, that the [G]overnment alleges namely that the professional purpose was that he fraudulently misrepresented [sic] that the contact was medically necessary.

> I find that medically necessary and medical purpose are synonymous in this context. . . .

> . . . .

> Now, this ruling does not limit evidence coming forward that there was no fraudulent representation because there was in fact a professional purpose for the exam. If evidence of a professional purpose comes out specific to the charged offense, that then would negate the Government's position that the fraudulent representation was medically necessary.

> . . . .

> Lastly, I find *that the Defense has failed to demonstrate based on the law that the Government must disprove beyond a reasonable doubt that there was no possible professional purpose for the exam.* I find that the elements require that the Government prove beyond a reasonable doubt, among other things, that [Appellant] committed the sexual contact by making a fraudulent representation that the sexual contact served a professional purpose, namely in this case that it was medically necessary.

(Emphasis added).

Appellant cites only the sentence of the military judge's ruling in which he stated the Government did not have to disprove beyond a reasonable doubt that there was no possible professional purpose. He claims that "by relieving the Government of having to prove that no professional purpose existed, the Government no longer had to prove the representation was fraudulent," because if it served any professional purpose, it would not have been fraudulent.[22]

---

[22] Appellant's specific argument is: "A representation is only true [sic] if an accused represents something fraudulent that the accused knows is fraudulent."

We do not share Appellant's interpretation of the military judge's ruling. The military judge found that even if the contact could serve *a* possible professional purpose, Appellant nevertheless could make a fraudulent representation to carry out *his* non-professional purpose. The Government still was required to prove that Appellant's representations regarding the professional purpose were fraudulent.[23] Moreover, Appellant does not allege how he was prejudiced by this part of the ruling. For example, he does not allege that the military judge extended this error to his rulings on any objections or to his instructions to the court members on the Government's burden of proof. Thus, even if the ruling suggested the Government's burden was lowered—and we find it did not—we find no prejudicial error.

## C. Expert Testimony – Medical Necessity

### 1. Additional Background

The concept of "standard of care" was introduced first by trial defense counsel, during individual voir dire. It became an issue after several patients testified, and just before the Government planned to call Maj BC as a witness. The military judge held an Article 39(a), UCMJ, hearing to consider the Defense's oral objection to Maj BC's anticipated testimony as an expert witness. The Government proffered Maj BC would "opine whether different procedures as described by the patient [were] medically necessary." The CDC argued:

> I don't believe that this witness is basing that opinion on actual guidelines, on actual standards of practice, on a standard that is actually appropriately applied in that type of community. My understanding is he's going to testify to say, "Well, in my experience in how we do things at Spangdahlem, that's not how I would have done that."

---

[23] Appellant asserts that because the military judge "failed to instruct the members on the meaning of medical necessity . . . it is impossible to know what standard the members applied when determining whether [Appellant] made a fraudulent representation that certain touching served a professional purpose." Appellant cites *Ruan v. United States*, ___ U.S. ___, 142 S. Ct. 2370 (2022), in support of this position. In *Ruan*, the United States Supreme Court addressed the mens rea required to violate a federal law circumscribing dispensing controlled substances, and found the requirement was knowingly or intentionally acting in an unauthorized manner. *Id.* at 2375. In Appellant's case, the mens rea was already part of fraudulent representation, which the military judge defined for the members as: "a representation of fact, which the accused knows to be untrue, which is intended to deceive, which does in fact deceive, and which causes the other person to engage in the sexual contact."

The military judge asked the Government, "I mean, so the point is there has to be some standard of care that you're saying that was breached. How do we get to that standard of care?" The CTC agreed.

After ascertaining the Defense would agree Maj BC was qualified regarding "what a clinical assessment is, how diagnoses work in relation to that, and . . . treatment" as well as "what AHLTA is and what the records are and what they mean," the military judge used the phrase "standard of care" when he asked the CDC if he understood the Defense's position:

> MJ: Where you are - if I understand correctly, the issue that's before the court at this moment is whether or not he is qualified as an expert, to discuss whether - what the standard of care was during these specific type of exams, and whether based on the records that standard of care was breached. Am I --
>
> CDC: That's - generally speaking, yes, Your Honor.
>
> MJ: Well, let's - is that the issue or not? When you say generally speaking - I don't want to miss anything.
>
> CDC: Well, it's - I don't know if this witness actually even knows what the standard of care means, according to some of those legal definitions. So the standard that I understand this witness is going to use is, "Based on my practice, and the way we do things at the Clinic, that wouldn't have met the standard of care." Or, "That wouldn't have been consistent with what we normally do." And that's not what an expert is supposed to testify to, or be able to testify to.

The CDC anticipated Maj BC would testify "that this is a deviation from the standard of care, that's going to match in with it being whether or not it's medically necessary." He further argued, "That's what it really comes down to, is at this point, how has this expert established what a standard of care actually is, to then be able to take the next step and talk about whether or not the standard of care is being met?" The Government countered, "Defense raised this issue of standard of care. It's a little bit of a red herring because what we're talking about is medical necessity."

Maj BC testified during this Article 39(a), UCMJ, hearing that he was a board-certified and licensed nurse practitioner, with associate's and bachelor's degrees in nursing and a master's degree as a family nurse practitioner. Moreover, he had treated thousands of patients over about seven years. For some period, he was Appellant's flight commander as well as a fellow primary care manager at the Clinic. He testified, *inter alia*, about clinical assessment, diagnosis, and treatment; the peer-review process; the practice of nurse practition-

ers compared to physician assistants;[24] generally accepted standards for medical examinations; national guidelines; and documenting in medical records, including using AHLTA.

The military judge ruled against Appellant, both orally and in a written ruling. Among his findings were that Maj BC was "qualified to give expert opinions relied upon by others within his field of practice in the medical community, for example, family health, and whether the standard of care has been met or deviated from." He continued: "[T]he panel will benefit from hearing from a medical expert who can better explain what the standard of care is and what is or is not medically necessary. The testimony will likely assist the trier of fact to understand this evidence." Regarding Maj BC, the military judge further stated:

> He has experience, education, and training in national guidelines, and although they are not absolute rules, he has learned how to judge the standard of care in his community based on his education, training, and clinical experience. He further testified that practitioners learn how to note if they are deviating from the recognized standard of care, and that this is considered in the overall assessment on whether an action is medically acceptable or necessary.

The military judge conducted an analysis under Mil. R. Evid. 403 and determined Maj BC's "testimony and opinion will be probative and reliable based on his education, training, and experience, and his significant background and training on how to conduct similar peer review analysis which he has experience in." And, noting the Defense had the assistance of several expert consultants, the military judge concluded Appellant "is not at a disadvantage if the [G]overnment offers this evidence at trial." He found "the testimony will not mislead the members, but on the contrary will be helpful in putting these specialized issues in context."

The Government called and re-called Maj BC on the merits to testify as a lay witness and an expert witness. Maj BC first testified about his professional

---

[24] Regarding the difference between nurse practitioners and physician assistants, Maj BC testified, "There is little difference in regards to clinical practice. It more has to come down to a legal sense. Nurse practitioners are afforded more clinical autonomy, based upon state laws." Col KK, who testified on the merits not as an expert but based on his experience training medical providers, stated he provided the same level of training to both nurse practitioners and physician assistants because they use "evidence based" and "standardized guidelines to train."

history, including working at the Clinic between 2016 and 2019. He also testified more generally about family practice care, and specifically about the facts of this case. In line with the Government's request, the military judge recognized Maj BC as "an expert in the areas of nurse practitioner, clinical assessment, diagnosis, and treatment as it pertains to family health or medicine." After the Government called several more of the victims, it re-called Maj BC to address their testimony, and repeated this pattern. In total Maj BC testified five separate times on the merits.

The Government questioned Maj BC about the medical necessity of Appellant's actions as the victims described. An example is this exchange regarding SC:

> Q. So based on what she said she told him, and what's documented in the practice management section of the medical records, would it have been appropriate or necessary, or within medical practice standards for him to recommend that she get a Pap [exam] done on 23 March 2017?
>
> A. It would not.

Maj BC, Dr. CS, and Dr. DT testified to some extent about what "standard of care" meant to them. On one of the few occasions the Government asked Maj BC about the standard of care, Maj BC answered in the context of medical necessity:

> Q. Was what was described by [MR] a targeted exam that was within the standard of care for this patient?
>
> A. Not at all.
>
> Q. What do you mean not at all? Why not?
>
> A. Because the - as we're trying to ascertain here from the witness' report, the listening that was being done, it served no medical purpose. You're using your stethoscope to listen, either lungs, heart, bowels, stuff like that - arteries. When you place your stethoscope over a dense area like breast tissue, as we've already heard from other witnesses, it can be harder to hear breast - or, lung sounds, or heart sounds in those areas. When you do it - when you place your stethoscope over and then you push the breast tissue up even more, you're almost guaranteeing you that the stethoscope that you're wearing and you're using has no utility at all.

And:

Q. So one last question. As a provider - you know - with your experience as a recognize[d] expert in this field, you're familiar with what the standard of care would be for somebody going through an[ ] assessment, diagnosis, and treatment?

A. Yes.

Q. And if they fall out of what is in that standard, or what they did was not medically necessary, you'd be able to identify that?

A. Yes.

Q. Was there anything about [MR's] testimony, or documentation she presented, that would come up with any clinical reason why the accused would need to manipulate her breast and touch her nipple in that way?

A. Not in the way she described, no.

After the last victim testified and the Government again re-called Maj BC, the CDC asked Maj BC about "standard of care":

Q. You talked a little bit about the standard of care. Can you define what standard of care is?

A. I guess that's - I'm not a lawyer, but I guess that's a little bit tenuous to say. I would say standard of care would be what a provider of like specialty would perform, consistent with national guidelines. I'm not a wordsmith on that.

Q. Fair enough. But you talked about the standard of care quite a bit, so I just wanted to make sure that it was clear what you meant and what you understood the standard of care was, and then we can discuss that a little bit more. So is it standard of care, like, what an average provider would do, what an excellent provider would do?

A. It's what the minimum expectation would be for that condition in that specialty.

Q. Minimum. The absolute minimum.

A. The minimum.

. . . .

A. Okay. Hopefully this will articulate it better. So in my specialty, the standard of care as we're trying to elicit here - the standard of care would be defined in the example of a patient who is 20 years old, female, comes in to be seen for a left ankle sprain. So in the course of that left ankle sprain they came in

31

for, the assessment of the standard of care being met or not met will be determined by what the provider decides to do based upon that concern. Did they check their vital signs? Did they gather a correct history and physical exam? Did they ask the right questions? Is that demonstrated that they considered other alternative diagnosis? Did the physical exam fit the reason for their visit that day? Did the diagnosis concur or fit for what they were being seen for and match the physical objective supporting findings? And then, did the treatment and/or any other evaluation match and/or be consistent for that diagnosis. Now, the national guidelines help inform what is consistent, rational, or reasonable when it comes to assessment and diagnosis of those conditions. And so taking that as a clinical picture as a whole, we review that in our specialty, as other specialties review each other inside theirs, as far as meeting the standard of care.

The Government also called Dr. DT, who was proffered and accepted as "an expert in OBGYN."[25] During re-direct examination, Dr. DT answered in the affirmative that "[s]etting aside this whole standard of care issue - legal, medical, or otherwise - [there are] medical standards" and that "there are left/right limits to what providers should be doing in the exam room."

The Defense called Dr. CS, who was proffered and accepted as an expert "MD with a specialty in OBGYN." In response to trial defense counsel's question, Dr. CS provided an explanation of how he forms opinions about medical necessity:

Q. [ ] In terms of standard of care, guidelines, recommendations, how did those inform the medical community's practice of determining whether or not things are medically necessary or unnecessary; exams, treatments, or procedures?

A. Well, we all need starting points to be able to determine things like that. So guidelines can help us, and again, guidelines are written typically by people who have knowledge, education, training, and experience. And essentially, that's what everything boils down to. So when I testify, or when I talk to my students I am relying on my knowledge, education, my - and my personal experience in medicine, and that helps me to define what I think is medically necessary and good medical care.

---

[25] Dr. DT testified, *inter alia*, about whether he would perform certain exams, or perform exams in a certain way, as described by various patients. Additionally, he provided his opinion about whether some of Appellant's actions were "clinically correct."

The CTC cross-examined Dr. CS regarding whether Appellant might have been inspecting SC for deep vein thrombosis. After Dr. CS referenced his direct examination testimony, during which he "talked about standard of care and . . . respected minority,"[26] the CTC asked:

> Q. Okay. But you would look at - you would agree standard of care is not the legal standard we're applying in this case?
>
> A. Well, it depends on which one. You said standard of care, so I always think legal in that case, because that's the way my brain is trained. But if you want to tell me another standard that we're talking about, that's fine.
>
> Q. Well, we're talking about medical necessity.
>
> A. And I just said, in my eyes, that's not medically necessary, but there could be a respected minority who would find it medically necessary.

Dr. CS testified later on re-cross-examination that "standard of care" and "whether something was medically necessary" were "not the same thing."

Maj BC, Dr. CS, and Dr. DT all had similar descriptions of "standard of care." Maj BC said "'standard of care' would be what a provider of like specialty would perform, consistent with national guidelines." Dr. CS agreed "standard of care" could be paraphrased as what a "similarly trained practitioner in the community . . . would do under the same circumstances." Dr. DT said "standard of care" in a peer-review setting was "an expectation [by a group of his peers] that I'm going to utilize the same training, knowledge, and professional recommendations to provide a certain degree of care to my patients."

Maj BC also testified that he understood Appellant's case was not about medical malpractice. The Government clarified with Dr. CS that this case was a criminal case, and not about malpractice. Dr. DT agreed that "standard of care" may have a legal definition, as in the context of medical malpractice.

### 2. Law

We review a military judge's decision to permit a witness to testify as an expert for abuse of discretion. *United States v. Flesher*, 73 M.J. 303, 311 (C.A.A.F. 2014). As the United States Court of Appeals for the Armed Forces (CAAF) has noted:

---

[26] Dr. CS testified "respected minority" are the medical providers who have a different way of practicing care than the majority of providers, but are not negligent "if they still use appropriate thought processes, they've had appropriate training, and if their care is reasonable."

> A military judge abuses his discretion when his findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law.

*Id.* (quoting *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008)).

"A witness may testify as an 'expert' on a particular subject matter only if the military judge determines that the witness is qualified based on his or her 'knowledge, skill, experience, training, or education' regarding that subject." *United States v. Allison*, 63 M.J. 365, 369 (C.A.A.F. 2006) (quoting Mil. R. Evid. 702). This threshold "requires only that the proffered witness have some specialized knowledge as a result of experience or education." *United States v. Mustafa*, 22 M.J. 165, 167–68 (C.M.A. 1986). We have held that by this standard, a person may qualify as an expert witness even if he or she is not "a star in the field." *United States v. Anderson*, 36 M.J. 963, 978 (A.F.C.M.R. 1993) (citations omitted), *aff'd*, 39 M.J. 431 (C.M.A. 1994). Under Mil. R. Evid. 702, an expert witness may testify, including providing opinions, so long as the testimony is helpful and based upon sufficient facts, reliable principles, and reliable application of the principles to the facts. "The CAAF has identified six factors for courts to analyze to determine whether a proponent of expert testimony has met the Mil. R. Evid. 702 criteria," which are:

> (1) the qualifications of the expert; (2) the subject matter of the expert testimony; (3) the basis for the expert testimony; (4) the legal relevance of the evidence; (5) the reliability of the evidence; and (6) that the probative value of the expert's testimony outweighs the other considerations outlined in [Mil. R. Evid.] 403.

*United States v. Knarr*, 80 M.J. 522, 537 (A.F. Ct. Crim. App. 2020) (alteration in original) (quoting *United States v. Billings*, 61 M.J. 163, 166 (C.A.A.F. 2005) (citing *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993))).

### 3. Analysis

Appellant asserts the military judge abused his discretion by allowing Maj BC "to testify outside the scope of his expertise." Appellant argues that the military judge "erred in concluding that Maj [BC], a nurse practitioner with a narrow scope of experience, could help define the bounds of medical necessity for a physician assistant." Appellant also claims "Maj [BC] spoke with a certainty his experience could not support." We find the former issue waived and the latter issue a matter of weight, not admissibility. These issues require no further discussion and do not warrant relief. *See Matias*, 25 M.J. at 361.

We understand Appellant's remaining arguments to be (1) the military judge erred by allowing Maj BC to testify about "standard of care," when the

issue was "medical necessity," and (2) "the military judge's ruling imposed no practical limit on Maj [BC]'s testimony beyond Maj [BC]'s own beliefs about an amorphous, unwritten standard of care." We find the military judge did not abuse his discretion when he accepted Maj BC as an expert and permitted him to provide expert testimony. The military judge understood the applicable law, and his application of the facts to the law was not clearly erroneous.

In his ruling the military judge used the phrase "standard of care," as he had during the hearing, almost synonymously with "medically necessary." In its case in chief, the Government generally did not do so; it focused heavily on the latter, whereas the Defense questioned Maj BC at length about "standard of care." The expert witnesses differentiated the concepts of "standard of care" and "medically necessary" in response to direct questions. Moreover, the expert witnesses each explained their understanding of "standard of care" in similar terms. What became clear through Maj BC's trial testimony is that he believed "standard of care" is not the same as national guidelines, but is informed by them, and relates to peer reviews of medical records.[27] While sometimes using the phrase "standard of care," Maj BC testified about medical necessity—for example, when he opined that one of Appellant's methods had "no utility at all" and he could discern no clinical reason for it. Such testimony was proper to assist the factfinder in determining whether Appellant fraudulently represented that his contact served a professional purpose.

Appellant claims the military judge erred when he did not limit Maj BC's testimony regarding "standard of care." But even if the military judge confused "standard of care" with "medical necessity" in his ruling, Appellant chose to make "standard of care" an issue in his case, including through the testimony of Maj BC. We find the military judge did not err in allowing Maj BC to answer questions relating to standard of care through his expert testimony relating to whether Appellant's action were medically necessary.

**D. Expert Testimony – Milgram Experiment**

Appellant asserts the military judge abused his discretion by allowing Dr. MC "to link this case with the Milgram experiment." We disagree.

---

[27] The Defense introduced testimony that peer reviews were "an ongoing regular assessment of provider skills" whereas a standard of care review focuses on something more specific and usually is related to a malpractice claim. Through another defense witness, the Defense elicited testimony that "[p]eer review . . . almost always will involve standard of care."

### 1. Additional Background

The Government planned to call Dr. MC, a forensic psychologist, to testify on three subject areas, including obedience to authority and "the Milgram experiment" in particular. The Defense objected, and the military judge conducted an Article 39(a), UCMJ, hearing, to consider the objections.[28] After hearing the arguments of counsel and considering the evidence presented, including testimony from Dr. MC, the military judge ruled Dr. MC could testify about the Milgram study.

Dr. MC provided a lengthy explanation of the study to the court members. An experimenter named Stanley Milgram conducted the study at Yale University in the 1960s. The study involved three individuals: a volunteer "subject," the "experimenter in a white lab coat," and a "learner" who the subject thought was another volunteer but actually was a "confederate" participant in the study. The "learner" was to be given words to memorize, then would have to recite back those words. The experimenter and subject were in the same room; the subject could hear but not see the learner. Dr. MC stated the "basic setup of the study" was the experimenter informed the subject "that every time the learner made a mistake on his words, [the subject] had to give [the learner] a shock, push a button to give him a shock." The subject was to increase the shock level 15 volts each time, and the voltage levels had labels like "mild shock," "medium shock," "extremely intense shock," and "dangerous serious shock," and "the last couple of shock levels just have [ ] 'XXX.'" Dr. MC continued:

> And the other main significant characteristic of the study is that there was an experimenter - someone identified as an experimenter in a white lab coat standing over the subject and kind of giving him instructions on what to do and encouraging him to continue if he showed any kind of hesitance to continue doing what they were instructed to do. And there was a script that the experimenter was using to give those instructions.
>
> Q [CTC]. What were the findings of those studies? What were psychologists able to learn?
>
> A. Well, in a very basic sense, what the study - at least the basic study that I'm describing to you now - found was how often or how willing people were to go all the way to 450 volts. And it's important to understand that the learner, who was the confederate, remember, and he was of course not getting really - real shocks - also had a script, and there were places along the way

---

[28] On appeal, Appellant does not renew his other objections to Dr. MC's testimony.

at certain shock levels where he would scream or pound on the wall, asked to be released, talk about a heart condition, and at some point, I think around 300 or so, he stops responding altogether. He doesn't say anything. He isn't answering the questions about the words learned and so on. And so one of the things that the experimenters just wanted to know is - you know - how far would people go under those circumstances? And as I mentioned a minute ago, one of the ancillary aspects of the study was asking other people what do you think you would do, what do you think other people would do in that - in those circumstances? Would you resist and say, "No, I'm not doing this anymore, because this guy seems like he's getting hurt." Or would they just go all the way and do what they were told? And most people underestimated the actual results. And the actual results were that everybody, every one of the subjects went past 300 volts [labeled "extremely intense shock"], and two-thirds of the subjects went all the way to 450 volts.

Dr. MC explained this study involved 40 male subjects, but Milgram and others performed myriad variations after the original published paper:

Now because of the way the study was done it's difficult, if not impossible, to do it today, because today we have stronger restrictions from an ethical point of view on what we can do with people, even volunteers. We can only cause them so much psychological distress. And as I mentioned, one of the things that Milgram pointed out is that these people seemed to show a lot of distress with what they had done and just kind of this realization that they were capable of doing these deeds that they had done. But, there have been other attempts to replicate at least parts of Milgram's research, and although again, if there are variations on it then you're going to expect to find different results somewhat, but I think for the most part the psychological community feels that the attempts at replication have, in a general sense, validated that research, even if it's not exactly the same as the way he did it back in the 60s.

After the Defense objected, then withdrew its objection, the CTC asked Dr. MC whether the study related to Appellant's case:

Q. With your review of the facts and hearing the witness testimony, is there a parallel between the research you've described on how people respond to and comply with people in position of authority, is there any of that evidence that parallels those principles you've heard as part of that research?

A. I believe it does, yes.

Q. And the research or variations you described on peer support or modeling, does the evidence and testimony, and information presented as part of this case parallel those principles that you've describe[d] as peer support or modeling when somebody gets to view somebody else rejecting authority?

A. Again, in my opinion, yes.

Later, Dr. MC testified about how the subjects of the Milgram study reacted to the debriefing:

And one of the justifications that they often gave for [why they did what they did] is . . . "You're the experimenter. I figured you knew what you were doing and you weren't going to let the guy get hurt. So I just kind of trusted you to take care of things."

. . . .

So they said - they were kind of trusting this authority figure to do the right thing, and figure out that "He knows better than I do. He knows what's going on more than I do. So if he's telling me to go ahead, then it must be okay."

The CTC asked, "How did the authors of this study explain their findings?" Dr. MC responded:

Well, they actually coined a term which is - the term is "normalizing trust" and essentially what they explain is that part of a functioning society is that there are certain people that we just have to kind of turn over our trust to, because they have specialized learning or expertise, or value that we can't provide, and so we kind of have to trust that they provide it. And then they also, in discussing that concept of normalizing trust, talked about what happens when we start getting evidence that that belief is false, or not warranted. And essentially what they say is, well, you look for rationales, justifications, to kind of help explain that disparity between what we believe we should be doing, which is trusting these people, and the evidence that's telling us we shouldn't.

Defense's cross-examination of Dr. MC ended with this exchange:

Q. You talked about normalizing trust, and you said that once people find out maybe they weren't supposed to trust them, they start to think differently about their experiences and think differently about what happened to them.

A. Well, no. What they're - they're trying not to think differently. It's actually the opposite. They're resisting the evidence coming in that contradicts that belief. So they are - what they're doing is they're finding rational - rationalizations that justify their continued trust in the authority figure.

Q. Or justify their actions after - or, during their contact with that authority figure.

A. Yes, during their contact with the authority figure.

Neither party had more questions of Dr. MC, the court members posed no questions, and the Government rested its findings case.

**2. Law**

"We review a military judge's decision to admit evidence for an abuse of discretion." *United States v. Norwood*, 81 M.J. 12, 17 (C.A.A.F. 2021) (citation omitted); s*ee also Flesher*, 73 M.J. at 311 (applying abuse of discretion to admission of expert testimony). We will find an abuse of discretion when the judge's findings of fact are clearly erroneous, the judge's decision is influenced by an erroneous view of the law, or the decision is outside the range of choices reasonably arising from the applicable facts and the law. *See Norwood*, 81 M.J. at 17.

Under Mil. R. Evid. 702, an expert witness may testify, including providing opinions, so long as the testimony is helpful and based upon sufficient facts, reliable principles, and reliable application of the principles to the facts. *See also Knarr*, 80 M.J. at 537.

"However relevant and reliable an expert's testimony might be," that testimony may be excluded under Mil. R. Evid. 403. *United States v. Traum*, 60 M.J. 226, 236 (C.A.A.F. 2004).

**3. Analysis**

Appellant asserts the military judge erred in his application of Mil. R. Evid. 401 and 403 concerning relevance and probative value.[29] He concedes that the Government, through Dr. MC, could offer testimony "that people tend to trust authority figures, including medical providers," but claims the "military judge should have found anything beyond generic testimony on obedience to authority irrelevant under Mil. R. Evid. 401." Appellant argues that "[t]he relevance

---

[29] Appellant argues, "While the military judge's analysis of the *Houser* and *Daubert* factors is flawed, it is the Mil. R. Evid. 401 and 403 analysis that is manifestly erroneous." *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–95 (1993); *United States v. Houser*, 36 M.J. 392 (C.M.A. 1993).

of a fifty-plus-year-old study of dubious ethical nature, with a different subject population and context, is minimal."

Additionally, he asserts the military judge erred in his Mil. R. Evid. 403 analysis by finding the evidence "would help the factfinder understand medical necessity." He asserts the "danger of unfair prejudice was evident" as "the expert psychologist connected a deeply concerning study—linked to obedience orders in Nazi Germany—to the facts of this case" and the evidence tended to "engender issue confusion and mislead the members."

On appeal, the Government describes the relevance of Dr. MC's testimony: "The Milgram experiment helped explain the psychology behind why the participants did certain things in response to an authority figure's directive, despite their discomfort," and "the Milgram experiment helped explain why the victims in this case did not do certain things during, or immediately after, their respective exams and why they trusted Appellant, despite their discomfort." In summary, "Dr. MC linked the subjects in the Milgram experiment to the victims in the case at hand by testifying that the two groups were similarly 'rationalizing their participation' because the authority figure 'knows better than I do.'"

At trial, the military judge found the proffered testimony about conforming to authority was probative of multiple issues. On one issue, we agree with Appellant that such testimony would not help the members determine "medical necessity." However, the military judge also found the evidence was probative based on, "more importantly," the issues raised during the examinations of witnesses. Regarding relevance, he stated:

> I believe that the [D]efense has opened the door when they asked questions about why certain complaining witnesses did not stop the exam or did not ask for a chaperone, or did not report to law enforcement, and why they didn't do things specifically in the exam environment, or why they did do certain things.

The military judge then found the testimony would not result in unfair prejudice, confusion of the issues, or wasted time. He "believe[d] the issues already . . . [have been] presented to the panel for consideration," and found that presenting the study would not "waste any time." As for prejudicial effect, on appeal the parties point out that it was trial defense counsel who presented to the members a link between this study and Nazi Germany.[30]

At this point in the trial, the Defense had elicited testimony about how the victims reacted during the encounters with Appellant, and that all but one did

---

[30] Appellant argues that "[t]he Milgram experiment is infamous, and anyone with a passing familiarity would make the link between the two."

not report Appellant's actions. Dr. MC used the study to inform his opinion relating to the victims' reactions to Appellant's sexual contacts. In this context, such testimony was not confusing and tended to help the factfinders understand the issues. Dr. MC did not agree the study was unethical, but noted it placed significant psychological stress on the subjects and therefore likely would not be replicated today. We find the military judge did not abuse his discretion in allowing Dr. MC to testify in this case about the Milgram study.

**E. Trial Counsel Argument**

Appellant claims the CTC made improper argument by: "(1) framing the allegations against [Appellant] in terms of a disconcerting psychological experiment involving fictitious shocking of subjects to the point of death; (2) providing definitions, sometimes conflicting, for the key term of each charge—medical necessity; and (3) arguing propensity."

**1. Additional Background**

During voir dire, all members agreed "to keep all of these allegations separate and not infer guilt for one specification based on another specification." Before they began deliberations, the military judge provided the court members a lengthy "spillover" instruction, which included the following:

> An accused may be convicted based only on the evidence before the court, not on evidence of a general criminal disposition. Each offense must stand on its own and you must keep the evidence of each offense separate. Stated differently, if you find or believe that the accused is guilty of one offense, you may not use that finding or belief as a basis for inferring, assuming, or proving that he committed any other offense.

> If evidence has been presented which is relevant to more than one offense, you may consider that evidence with respect to each offense to which it is relevant.

Further, the military judge instructed the court members about the limited use of some evidence. Specifically, evidence of Appellant violating the patient chaperone policy and failing to document patient encounters could be considered to prove Appellant: (1) intended to commit sexual contact and had an intent to arouse or gratify his sexual desires; (2) created an opportunity to engage in prohibited sexual contact to arouse or gratify his sexual desire; and (3) had a plan or design to commit the offenses by creating an opportunity to be present with the alleged victims without a chaperone, and ensuring he could not be

caught by another provider reviewing his documentation, so that he could engage in prohibited sexual contact to arouse of gratify his sexual desires.[31] The military judge reminded the members that they could not consider this evidence for any other purpose, and also could not conclude from it that Appellant was a bad person or had general criminal tendencies and that he therefore committed the offenses charged.

The Government displayed about 140 slides during its findings argument. One slide echoed the military judge's instructions about opportunity, plan or design, and intent. Other slides showed commonalities in the fact patterns of each offense concerning a patient. The Government addressed each specification with a set of slides tailored to that offense but with the same framework: the victim's complaint when she made the appointment, the "[C]linic process" for getting a chaperone, the five steps involved in Appellant's "cover up" of his actions, and the drawing the victim made in court identifying where Appellant touched her. Some slides included one or more yellow triangular high-voltage warning signs.

In his argument, the CTC likened Appellant's conduct to that of the experimenter in the Milgram study. He argued that Appellant "turned up the voltage," testing how far the patient would allow him to go, to see what she was "comfortable with." He argued that Appellant was opportunistic: "[The victim was n]ot there for a reason that would require a witness, [Appellant] starts to test the boundaries, the voltage goes up, gets access, and does not do something that's medically necessary." The CTC also suggested an explanation for why the victims permitted Appellant's conduct and did not report him. The following is illustrative of the Government's theme in findings argument:

> Does Airman [TM] go out and get a chaperone right now because it's a sensitive exam? No, he does not. But, as you'll see when we get into the room, that's where this goes. And the accused does not go out and get a chaperone when he knows he should. He knows he should. He's already describe[d] for law enforcement that he knows he should. And he doesn't do it.
>
> Here's how the coverup works. He differentiates her from the patient pool from when he gets in there. She comes in for a reason. He's going to see her for that reason. But then he makes a

---

[31] In his written ruling denying the Defense motion to exclude evidence of the chaperone policy under Mil. R. Evid. 404(b), the military judge found, *inter alia*, "[t]he evidence presented can be viewed by the factfinder as reasonably showing that in order to meet his intent, the accused created an opportunity where he could engage in the fraudulent exams without witnesses (chaperones) present. Further, that by doing this on nine different occasions, he created a common plan or scheme."

decision when he gets her on the table. "Hey, let's see where this goes. Let's see where this goes." And he pushes the limits. He pushes the limits. There's no reason for a sensitive exam there. The technician knows; for irregular heartbeats, as you've heard already, are common. Like one of the most common things. He knows nobody's coming in. So he pushes the limits to test the boundaries. He increases the voltage.

. . . .

He's ramping up the voltage. This is exactly the same as Doctor [MC] testified to, about the studies of human behaviors; we rely on sources of authority, right? We're like, "Oh, yeah." We transfer trust to those individuals who are in white lab coats. We do that. And she had - she testified she had no idea that there was anything wrong. She had no idea that maybe something was amiss. And he doesn't perform the real breast examination. He doesn't do it, right. And he doesn't document it. Because it never happened. It never happened.

Again, every single victim was snared under this exact same specific set of circumstances.[32] How many until it's just no longer a coincidence?

Trial counsel also argued, "So if it's something you didn't need to do based on how she presented, it wasn't necessary." He also noted:

Let's take a time out right here. Medical necessity. If you don't need to do it as part of how the clinical assessment goes, if you don't need to do it, it's not necessary. That's the standard that's in front of you. There's been a lot of talk about standard of care. Could the person do anything they wanted? No, because - you know - we'll talk about this some more - a like-minded group "Hey, look, alright, I wouldn't have done that," which we've heard multiple times from every expert. "I wouldn't have done that." But - you know - standard of care is not it, is it medically necessary? So if it's something you didn't need to do based on how she presented, it wasn't necessary. It wasn't necessary.

Towards the beginning of his rebuttal argument, the CTC again argued coincidence, stating,

---

[32] The phrase "each victim [was] <u>snared</u> under the exact same specific circumstances" was in all capital letters on a slide showing the nine victim-patients, and the same or similar slide followed the set of slides presented for each specification.

[W]e're going to talk about Occam's razor. Have you ever heard about Occam's razor? The simplest answer is likely the right one. It marries up in this case with another phrase, maybe you've heard it. If it happens once, it's an accident. Twice, it's a coincidence. Third time, it's a trend. Have you ever heard of that phrase? What's 10? I don't know how the phrase ends. Does it keep going to 10? Four is a group, five is a crowd, six is - I don't know. The simplest solution is likely the right one.

Additionally, and with a corresponding slide, the CTC argued:

Because for any one of these offenses to have been innocent, any one of them to be an innocent, well-intentioned medical procedure, at least four things would have had to happen. Four unlikely events.

A sensitive exam was required despite there being no indication or need for one during the [reason for] the appointment. One, that he had ineptly performed the exam. That he had ineptly perform[ed]. What is- he didn't really do the exam that - you know - everybody is saying happened - he didn't actually do it when you get into it. That he just forgot to have a chaperone. He's inept. He forgot a chaperone, and he just happened to forget to document that one part of the exam, and the accompanying complaint - you know - a significant part - witness - significant part - doesn't document that either that would indicate a sensitive procedure had been done. All unlikely events. For one patient. For a single event. The probability that the chaperone, combined with a lack of documentation for that specific thing is improbable for one of them. Improbable circumstances. That that would have occurred together. It's exceedingly low.

But members, the probably that this happened 10 different times approaches zero. Approaches zero. The judge will give you instructions that say you can consider this as opportunity, plan, intent, gratify sexual desires by the way he worked this system.

Trial defense counsel did not object during the CTC's findings argument, or to his accompanying slide presentation.[33] The military judge advised the court members both before and after findings argument that the arguments of counsel were not evidence.

---

[33] The Defense raised one objection during rebuttal argument, on a matter unrelated to the issues Appellant raised on appeal.

**2. Law**

We review claims of prosecutorial misconduct and improper argument de novo. *See United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019). When an appellant did not object at trial to trial counsel's argument, courts review for plain error. *Id.* (citing *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018)).

> Plain error occurs when (1) there is error, (2) the error is clear or obvious, and (3) the error results in material prejudice to a substantial right of the accused. Thus, we must determine: (1) whether trial counsel's arguments amounted to clear, obvious error; and (2) if so, whether there was a reasonable probability that, but for the error, the outcome of the proceeding would have been different.

*Id.* at 9 (internal quotation marks and citations omitted). The burden to establish plain error, including prejudice, is on the appellant. *Id.* at 9, 12.

In presenting argument, trial counsel may "argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (citation omitted). Trial counsel may strike hard but fair blows; they may not "inject [their] personal opinion into the panel's deliberations, inflame the members' passions or prejudices, or ask them to convict the accused on the basis of criminal predisposition." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citations omitted). In determining whether trial counsel's comments were fair, we examine them in the context in which they were made. *United States v. Gilley*, 56 M.J 113, 121 (C.A.A.F. 2001) (citations omitted). We do not "surgically carve out a portion of the argument with no regard to its context." *Baer*, 53 M.J. at 238 (internal quotation marks omitted).

In *United States v. Burton*, 67 M.J. 150 (C.A.A.F. 2009), a case in which the appellant was charged with two sexual offenses occurring four years apart, the CAAF considered the trial counsel's findings argument that had invited the court members to compare the charged offenses. After noting the military judge's spillover instruction, trial counsel told the court members that they "could not use guilt of one offense as proof of guilt of another offense." *Id.* at 152. Then the trial counsel in *Burton*

> told the panel it could "take these things and compare them for [the appellant's] propensity to commit these types of offenses." He invited the panel to "take both of [the victims'] stories and lay them next to each other and compare them and see what this particular person's M.O. is."

*Id.* (second alteration in original). The CAAF held that "[t]he Government may not introduce similarities between a charged offense and prior conduct, whether charged or uncharged, to show modus operandi or propensity without using a specific exception within our rules of evidence, such as [Mil. R. Evid.] 404 or 413." *Id.* (citation omitted). The CAAF continued: "It follows, therefore, that portions of a closing argument encouraging a panel to focus on such similarities to show modus operandi and propensity, when made outside the ambit of these exceptions, is not a 'reasonable inference[ ] fairly derived' from the evidence, and was improper argument." *Id.* at 153 (alteration in original) (quoting *Baer*, 53 M.J. at 237). As the CAAF noted:

> The real risk presented by trial counsel's improper argument was that it would invite members to convict [the] appellant based on a criminal predisposition, not that members would now perceive properly admitted direct evidence of charged conduct as propensity evidence. This greater risk was properly addressed by the military judge's spillover instruction. The military judge having instructed the panel that counsel's arguments were not evidence and given a general spillover instruction, it was not plain and obvious that an additional instruction was wanted or needed.

*Id.* at 154 (citation omitted). "In the context of the entire trial," including the Government's presentation of evidence and argument, and the military judge's instructions, the CAAF did "not believe that any error in trial counsel's argument rose to the level of plain error that would require the military judge to *sua sponte* instruct on the proper use of propensity evidence or take other remedial measures." *Id.* (citation omitted).

It is a permissible inference, referred to as the "doctrine of chances," to consider two otherwise independent events that, taken together, are unlikely to be coincidental. *See Estelle v. McGuire*, 502 U.S. 62, 69 (1991). That differs from the inference covered by the character evidence rule, which prohibits inferring a defendant's guilt based on an evil character trait. *See Michelson v. United States*, 335 U.S. 469, 475–76 (1948). The "doctrine [of chances] posits that 'it is unlikely that the defendant would be repeatedly innocently involved in the similar suspicious situations.'" *United States v. Matthews*, 53 M.J. 465, 470 (C.A.A.F. 2000) (quoting 1 Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 5:28 at 78 (1999)). The doctrine most often is employed to show the unlikelihood of accident. *See generally* Edward J. Imwinkelried, *An Evidentiary Paradox: Defending the Character Evidence Prohibition by Upholding a Non-Character Theory of Logical Relevance, The Doctrine of Chances*, 40 U. RICH. L. REV. 419 (2006).

### 3. Analysis

Appellant did not object to the argument or the accompanying slides at trial. We review trial counsel's argument for plain error.

#### a. Milgram experiment

Appellant claims the following errors related to the CTC referencing testimony about the Milgram experiment: (1) the experiment has negative connotations; and (2) repeating the word "voltage" and displaying high-voltage symbols in the slides.

We find no error—let alone any error that was clear or obvious—in allowing trial counsel to argue reasonable inferences from facts in evidence, including the description of the Milgram experiment. Whether that original experiment would be replicated in light of today's ethical standards was addressed through Dr. MC's testimony. Moreover, its connection to "Nazi Germany" was elicited by the Defense and was not part of trial counsel's argument.

We find trial counsel displaying high-voltage signs on slides and repeating the word "voltage" in argument was not clearly erroneous. Trial counsel used "voltage" as a metaphor, and did not imply that Appellant shocked, used electricity, or otherwise inflicted physical pain to his patients. We generally agree with the Government's characterization, on appeal, of this evidence—namely, that trial counsel "employed the idea of increasing the voltage [ ] in the context of Appellant testing the boundaries of the victims and the victims complying with his requests." This was permissible argument in light of the evidence presented.

#### b. Definitions

Appellant asks us to find trial counsel improperly argued the meaning of "medically necessary." He argues trial counsel argued "several formulations" for the "standard for necessity" and these standards were "inconsistent both with each other and with a criminal trial." We find trial counsel did not commit error in his argument about medical necessity.

First we consider and reject Appellant's claim that the CTC argued "medically necessary" meant "required." Appellant quotes the CTC's argument that, "[i]f you don't *need* to do it as part of how the clinical assessment goes . . . it's not necessary," and "if he didn't *have* to do it as part of the reason why she presented, it's not necessary. It's not medically necessary." (Emphasis added). Based on these statements by the CTC, Appellant argues on appeal:

> Each of these formulations creates an artificial medical standard—that there is some established standard of what you *must* do with each patient. The corollary is that doing more is a crime. This cannot be. It is directly contrary to what the military judge

47

explained, that medical necessity is the same as saying "for a medical purpose."

We do not read trial counsel's argument as conveying the idea that some standard *required* Appellant to perform certain actions on his patients for his actions to be medically necessary. Moreover, as discussed in Section B, *supra*, the military judge did not rule that "medically necessary" was synonymous with "medical purpose." As the military judge explained to the parties, outside the presence of the members: "I am assuming that if there is a medical purpose, then it's medically necessary for him to do it. But I don't think that's the crux of any argument now that we've fleshed this out."

Appellant also claims that the CTC distinguished "medically necessary" from "standard of care," andthen subsequently embraced the latter, "inject[ing] a civil negligence analysis into a criminal trial." We disagree that the CTC blurred the concepts or argued a negligence standard. During their testimony, the Government clarified with Maj BC, Dr. DT, and Dr. CS that this case was a criminal case, and not about malpractice; the CTC's findings argument did not suggest anything to the contrary.

The CTC suggested the members should give more credit to the testimony of the family medicine providers than to the Defense's specialists because those providers are the most "similarly situated" to Appellant in terms of "standards of care medicine." Specifically, the CTC posited: "Who were the similarly situated providers who know what they do and what they don't do at a family practice - not a specialist - a family practice [provider] and how they respond to specific types of clinical indicators that present there." The CTC's argument here was not about the meaning of medical necessity or the burden of proof, but to which witness's testimony the factfinder should afford the most weight when determining whether Appellant's purpose was for medical necessity.

### c. Propensity

Appellant claims the Government went beyond the military judge's ruling that permitted evidence of failure to document and failure to use a chaperone as evidence of common plan or scheme, intent, and opportunity. Appellant asserts the findings-argument slides are "a study in propensity," with "[e]ach complaining witness [ ] lumped together, irrespective of the differences in the facts." The essence of Appellant's claim is that the CTC's argument "invited the members to convict [Appellant] because of the strength of a supposed pattern, rather than allowing each offense to stand on its own merits." Appellant does not challenge directly the military judge's ruling which found the Government could introduce evidence under Mil. R. Evid. 404(b) that Appellant, by failing to utilize a chaperone "on nine different occasions, [ ] created a common plan or scheme."

The Government asserts that arguing a pattern was a "perfectly permissible description of the common plan and scheme Appellant employed to commit his crimes." The Government accurately notes that "trial counsel clearly laid out the steps in the scheme and applied that framework to the individual evidence of each victim and specification separately." Finally, the Government asserts the CTC argued *against* propensity in findings argument when he paraphrased Dr. MC's testimony and stated, "[T]here is no character type that makes somebody more or less likely to commit the offense."[34]

We find the CTC did not improperly argue propensity. We do not read the CTC's argument to suggest that Appellant was someone prone to commit these crimes or who had a general criminal disposition. Moreover, the CTC did not invite the court members to conclude that because Appellant was accused of more than one sexual offense, the allegations were more likely to be true, or otherwise to consider improper "spillover" of evidence. We read the CTC's references to "Occam's razor" and coincidence—that the "simplest solution is likely the right one"—to be an argument about making reasonable and rational inferences from all the evidence presented in this case. *See Long*, 81 M.J. at 369. The CTC was permitted to argue the credibility of the witnesses and the lack of accident or mistake, as well as a common plan.[35]

The CTC addressed the facts of each specification individually, while also highlighting the commonalities. He was permitted to argue evidence that Appellant had a plan or scheme—to include the limited-purpose evidence involving chaperones and documentation—and was not prohibited from explaining how Appellant employed a similar plan or scheme with each victim. We find no error in the Government's findings argument,[36] much less plain error.

---

[34] The CTC continued: "And that's the exact principle that the accused was counting on when he took the steps with his patients in a very unique set of circumstances that repeated over and over again, to go past the point of medical necessity, so that he could touch the genitalia of these victims, to gratify his sexual desire."

[35] The military judge provided the members lengthy instructions regarding witness credibility, and instructed them on the defenses of accident and mistake of fact applicable to the offenses under review. Appellant does not claim those instructions were erroneous.

[36] Although we do not find error, we do not recommend the CTC's approach as a model argument. Counsel should be wary of presenting arguments or slides that so closely approach the line between proper and improper matters, including spillover, propensity, or inflaming the passions of the fact-finder.

### F. Format of Victim Impact Unsworn Statement

Appellant contends that the military judge abused his discretion in allowing victims to have their written unsworn statements read to the court members. Specifically, he asks this court to find error where trial counsel read three victim unsworn statements to the court members, and where the military judge—without articulating good cause—allowed special victims' counsel to read their clients' unsworn statements to the court members. Appellant asks us to set aside his sentence as a remedy. We find relief is not warranted.

### 1. Additional Background

In an Article 39(a), UCMJ, hearing during presentencing, the military judge discussed with the parties the victim unsworn statements and their presentation.[37] The CTC stated, "[RH] wants to read her statement by phone. And then two of the [Special Victims' Counsel (SVCs)] are going to read their statements." The Defense objected to portions of some statements, which portions the victims then edited. Ultimately, six victim unsworn statements were admitted as court exhibits without objection.

With the court members present—and after the Government rested its case in presentencing—the CTC told the military judge that "some of the victims requested that [trial counsel] read their statement on their behalf," to which the military judge responded, "Okay." Soon thereafter, the CTC stated, "[T]wo of the victims have counsel in the room, and those counsel are going to read them and then publish[38] them," to which the military judge responded, "Great. Thank you for pointing that out." Trial counsel then read Court Exhibits 1 and 2—victim statements of SC and MR—to the members, and published them. RH, appearing by telephone, read Court Exhibit 3 to the members, and trial counsel published it. Trial counsel then read and published Court Exhibit 4— the victim statement of EP. The SVC for BJ read and published Court Exhibit 5, and the SVC for CS read and published Court Exhibit 6. The counsel did not read the statements in a dramatic fashion.[39] Immediately after the victim statements were given, Appellant made an oral unsworn statement, then defense counsel published Appellant's written unsworn statement and rested.

---

[37] This hearing followed earlier sessions concerning the substance of the victim unsworn statements.

[38] We understand the term "publish" used in this context to mean to provide a copy of the exhibit to the court members.

[39] Having listened to the audio recording of the readings, and reviewed the transcript, we generally agree with Appellant's characterization in his brief that the readings were "sometimes monotone and sometimes emotional." None displayed significant emotion.

Appellant presented no other information in presentencing for the members' consideration.

Before the members' deliberations on sentence, the military judge provided them instructions regarding victim unsworn statements and Appellant's unsworn statement. At no point did the trial defense counsel lodge an objection to the delivery of the victim unsworn statements.

**2. Law**

We review a military judge's interpretation of R.C.M. 1001[40] de novo, but review a decision regarding the presentation of victim-impact statements in presentencing for an abuse of discretion. *See United States v. Hamilton*, 78 M.J. 335, 340 (C.A.A.F. 2019); *United States v. Barker*, 77 M.J. 377, 382–83 (C.A.A.F. 2018). A military judge abuses his discretion when he makes a ruling based on an erroneous view of the law. *See Barker*, 77 M.J. at 383.

Article 6b, UCMJ, 10 U.S.C. § 806b, details several rights belonging to crime victims. Among them are the "right to be reasonably heard at . . . [a] sentencing hearing relating to the offense," and the "reasonable right to confer with the counsel representing the Government" at a court-martial proceeding relating to the offense. Article 6b(a)(4)(B) and 6b(a)(5), UCMJ, 10 U.S.C. §§ 806b(a)(4)(B), 806b(a)(5); *see also* R.C.M. 1001(c)(1) ("[A] crime victim of an offense of which the accused has been found guilty has the right to be reasonably heard at the presentencing proceeding relating to that offense.").

"The right to make an unsworn victim statement solely belongs to the victim or the victim's designee and cannot be transferred to trial counsel." *United States v. Edwards*, ___ M.J. ___, No. 21-0245, 2022 CAAF LEXIS 283, at *16 (C.A.A.F. 14 Apr. 2022) (first citing *Hamilton*, 78 M.J. at 342; and then citing *Barker*, 77 M.J. at 378). This right "is separate and distinct from the [G]*overnment's* right to offer victim impact statements in *aggravation*, under R.C.M. 1001(b)(4)." *Id.* (quoting *Barker*, 77 M.J. at 378). "Upon good cause shown, the military judge may permit the crime victim's counsel, if any, to deliver all or part of the crime victim's unsworn statement." R.C.M. 1001(c)(5)(B).

Notwithstanding a victim's right to be reasonably heard, a military judge has the responsibility to "[e]nsure that the dignity and decorum of the proceedings are maintained," and shall "exercise reasonable control over the proceedings." R.C.M. 801(a)(2)–(3); *see also LRM v. Kastenberg*, 72 M.J. 364, 372 (C.A.A.F. 2013) (noting that a victim's "right to a reasonable opportunity to be

---

[40] Rules addressing a victim's right to be reasonably heard were contained in R.C.M. 1001A, 2016 *MCM*. However, those rules are now contained in R.C.M. 1001(c). *See* 2019 *MCM*, App. 15, at A15-18 ("R.C.M. 1001(c) is new and incorporates R.C.M. 1001A of the MCM (2016 edition)."). Our analysis cites to these versions as applicable.

heard on factual and legal grounds" is "subject to reasonable limitations and the military judge retains appropriate discretion under R.C.M. 801").

Where an appellant did not object to the presentation of victim matters, we review for plain error. *Cf. United States v. Gomez*, 76 M.J. 76, 79 (C.A.A.F. 2017). An appellant bears the burden of establishing the three prongs of the plain-error framework: "(1) there was error; (2) the error was clear or obvious; and (3) the error materially prejudiced a substantial right." *Id.* (citation omitted). When testing for prejudice in the context of sentencing, we determine whether the error substantially influenced the adjudged sentence by considering the following four factors: "(1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *Hamilton*, 78 M.J. at 343 (quoting *United States v. Bowen*, 76 M.J. 83, 89 (C.A.A.F. 2017)). "An error is more likely to be prejudicial if the fact was not already obvious from the other evidence presented at trial and would have provided new ammunition against an appellant." *Barker*, 77 M.J. at 384 (citation omitted). An error is more likely to be harmless when the evidence was not "critical on a pivotal issue in the case." *United States v. Cano*, 61 M.J. 74, 77–78 (C.A.A.F. 2005) (internal quotation marks and citation omitted).

### 3. Analysis

The issue on appeal is not whether the military judge erred by allowing the victims' unsworn statements to be admitted and presented[41] to the court members; Appellant does not object to the substance of the statements. The issue is whether the military judge erred by allowing trial counsel and two special victims' counsel to deliver aloud the properly admitted statements to the court members just before they were provided written copies, and whether that error resulted in material prejudice.

We make several assumptions for purpose of analysis: (1) Appellant forfeited, but did not waive, this issue;[42] (2) trial counsel may not read aloud a

---

[41] We are mindful that unsworn victim statements are not admitted as "evidence." *United States v. Tyler*, 81 M.J. 108, 112 (C.A.A.F. 2021).

[42] Appellant did not object to the presentation of the victim unsworn statements entered as court exhibits, although he had objected to the substance of some earlier versions.

victim's admitted written unsworn statement to the sentencing authority during presentation of victim matters;[43] and (3) the military judge failed to consider whether the victims showed good cause to allow their counsel to read aloud their statements.[44] Assuming error, we find no prejudice.

In this case, counsel's readings of these statements provided no "new ammunition" against Appellant. *See Barker*, 77 M.J. at 384. We find that simply reading the written documents to the court members did not amount to any significant addition to, or expansion of, the statements. *See Edwards*, 2022 CAAF LEXIS 283, at *17–18 (finding that in producing a victim-impact video containing images and music, "trial counsel made creative and organizational decisions that . . . incorporated her own personal artistic expression," and thereby "misappropriate[d] the victim's right to be heard"). Any error here "did not involve the subject matter, but rather the form in which it was presented." *See United States v. Kerr*, 51 M.J. 401, 406 (C.A.A.F. 1999).

We find trial counsel and special victims' counsel reading aloud the victim unsworn statements had no substantial influence on the sentence. Those readings did not change the strength of the parties' cases, with the Government's case being significantly stronger than Defense's.[45] The readings were not an improper government attempt to "slip in evidence in aggravation that [ ] would otherwise be prohibited by the Military Rules of Evidence." *Hamilton*, 78 M.J. at 342. Had the victims personally read their statements to the members, they *may* have imparted more emotion than counsel, whose readings did not add substance to the words on the page. We are not convinced Appellant suffered any prejudice when trial counsel and special victims' counsel read the victims' statements aloud to the court members in this case. Finding no prejudicial error, we decline to grant relief on this issue.

---

[43] We do not consider a related issue not raised in this case: whether, during argument on sentence, counsel is permitted to read out loud some or all of the already-admitted victim unsworn statements. *Cf. Tyler*, 81 M.J. at 113 (finding that "presentencing argument may include comment on the victim's unsworn statement").

[44] We could presume the military judge knew and followed the law, including when and how to apply the standard of whether good cause was shown; the record is clear this military judge was familiar with R.C.M. 1001(c). *See United States v. Erickson*, 65 M.J. 221, 224 (C.A.A.F. 2007) ("Military judges are presumed to know the law and to follow it absent clear evidence to the contrary.").

[45] The victims were not parties, and their unsworn statements were not part of the Government's case. *See Edwards*, 2022 CAAF LEXIS 283, at *16; *L.R.M.*, 72 M.J. at 368 (finding the victim was a "nonparty to the court[ ]-martial"). We acknowledge, however, that the content of those statements favored the Government.

### G. Sentence Severity

#### 1. Additional Background

In presentencing, the Government introduced into evidence a Letter of Admonishment (LOA) Lieutenant General (Lt Gen) Timothy Ray, Commander, Third Air Force,[46] issued to Appellant on 30 September 2016 for conduct while Appellant was on temporary duty to Camp Bullis, Texas, and Appellant's response to the LOA. The LOA alleged that Appellant "repeatedly brushed [his] arm and elbow against [SL] and [DN], contacting their breasts on several occasions."[47] It also stated Appellant stared at SL's breasts, making her feel uncomfortable. Paragraph 2 stated:

> You are hereby admonished! As an officer in the United States Air Force, you have significant authority over others, and you must treat them with dignity and respect at all times. You are also expected to maintain the highest standards of deportment and good behavior. [SL] described troubling conduct that went beyond your negligently entering her personal space, and I felt strongly that your poor behavior needed to be addressed at a higher level. Let me be very clear about one thing. You were a hair's breath away from my offering you a much more severe sanction, one that might have had career-ending consequences. You are very fortunate that your Squadron, Group, and Wing Commanders spoke up for you. If they were not convinced you could internalize the message that any unwanted or offensive conduct toward a fellow Airman or civilian is unacceptable, I assure you that this action would have been much harsher. Going forward, I expect you to scrupulously adhere to the highest standards and to be a model officer. Be warned, the Air Force, as an institution, has a long memory, and I and your future commanders will not hesitate to take swift action against you if you ever again engage in similar behavior.

In his response to the LOA, Appellant insisted he "did not intentionally touch the breast of any female during training at Camp Bullis, Texas." He also maintained that he did not know he made anyone at training feel uncomfortable. He said such behavior was "not in [his] character," and "[he] continue[d] to

---

[46] Lt Gen Ray was not the commander who referred the charge and specifications against Appellant in June 2019 to a general court-martial.

[47] Specification 12, of which Appellant was acquitted, alleged this touching of SL's breast with his elbow.

strive for excellence in patient care as well as set a good example for others around [him]."

In addition to the LOA, the Government introduced a personal data sheet, and Appellant's officer performance reports and enlisted performance reports.

Six victims made unsworn statements describing the impact Appellant's crimes had on them. Following are some excerpts from their statements:

- SC said that she had been "worried" about having a male provider, Appellant. "It took me a few visits w[h]ere technicians had to be present in the room before I knew I could trust my new doctor." She described how Appellant's actions towards her affected her "worklife," stating, "Having a male customer in the store alone with me made me tense also panic at times."
- MR said: "I have nightmares. I have daydreams – distractions in my life rethinking about what he did to me" and, "I will have to live with what he did to me, the trust he violated, for the rest of my life."
- RH said: "I have had to seek therapy and have had to relive those moments over and over again. All the pain and discomfort has numb[ed] my emotions at times and I would never wish this experience on anyone. The empty feelings this has given me while having had to work through months of depression has been hard on my mental and emotional state and has interfered with everyday life and interactions with co-workers and loved ones."
- EP said, "I still struggle with self-blame for why I did not report this offense directly or even stop [Appellant] and ask for a chaperone before he violated me. . . . This is where a lot of my anger stems from and regret can last a long time. I experience immediate anxiety for any doctor's appointment to this day, even if the appointment is for my children. I question every move a doctor makes and am left with the lingering impact of me not feeling really [ ]comfortable with male physicians." EP also described how Appellant's crime affected her schooling, her views on parenting, and her relationships with her husband and children.
- BJ said, "In December 2016, after my appointment, I knew something about it felt odd. I went home and scrubbed my body repeatedly because I felt so disgusting and shameful. It was even worse because I was pregnant at the time and I felt that I had not protected my baby. Afterward, I would think to myself that he is my doctor and I should trust him, but I couldn't, or any other male doctor after him. . . . I experienced symptoms of anx-

iety, depressing and crippling shame." She continued, "Flashbacks turned into night terrors to where I would wake up in a panic. It's difficult for me to trust anyone since a doctor should arguably be a person you can trust the most."

- CS described how "[t]hat day, that experience, changed everything" for her. She noted: "Prior to that appointment, I had no issues, hesitations, or anxiety when going to a medical appointment. I had trust in the medical staff. I never felt the NEED for a chaperone. Prior to that appointment, I'd never experienced anxiety over being alone with male medical professionals." After the appointment, she worried about seeing Appellant again, and did at the post office. She added: "I . . . couldn't even proceed to pick up my mail. Instead, I ran out crying and endured an anxiety attack in my car." She also stated: "Because of [Appellant's] actions, I fear going into medical exams, I have lost trust in male medical providers, and have increased anxiety. His actions were a key factor in my decision to no longer continue my military service."

Appellant introduced no evidence in presentencing. He provided written and oral unsworn statements, mostly addressing his childhood, family, and career.

Trial counsel argued for a sentence consisting of a dismissal, "a minimum of 10 years of confinement," and forfeiture of all pay and allowances. The Defense argued against a dismissal and for nine months of confinement. Neither party argued for a reprimand.

**2. Law**

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(d)(1), UCMJ. "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (per curiam) (alteration in original) (quoting *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam)). Although we have great discretion to determine whether a sentence is appropriate, we have no authority to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

### 3. Analysis

Appellant asserts his sentence is inappropriately severe because the nine years in confinement (1) is arbitrary, (2) is excessive, given he also was adjudged a dismissal, and (3) combined with the dismissal, "falls heaviest on his family." He asks this court to set aside and reassess his sentence.

Appellant argues the sentence to confinement was arbitrary, noting Appellant was convicted of nine specifications and was sentenced to nine years in confinement. First, we note the Government made no such argument during sentencing. However, Appellant's trial defense counsel did make a connection between time and specifications. The Defense suggested that nine months is the maximum amount of confinement the members should adjudge, stating, "You've got nine different specifications. That's 30 days to think about those few seconds in that exam room." Appellant does not assert—and we do not find—that an argument for a period of confinement to reflect on one's crimes is improper. We do not join in Appellant's speculation that the members arbitrarily sentenced him to one year for each specification.[48] Similarly, Appellant has not put forth any convincing argument that his sentence was too severe or punishes his family.

Appellant committed crimes against the victims by taking advantage of his position of trust as their medical care provider. While Appellant did not physically harm his victims, many indicated they suffered lasting psychological harm as a result of his actions against them. The members had before them all the evidence from the findings portion of the trial, plus evidence of Appellant's service record that the Government introduced in presentencing. Included was the admonishment Appellant received less than three months before his first assault on a patient, which strongly warned that "any unwanted or offensive conduct toward a fellow Airman or civilian is unacceptable." The members also had the victims' and Appellant's unsworn statements for their consideration. Having given individualized consideration to Appellant, the nature and seriousness of the offenses, Appellant's record of service, and all other matters contained in the record of trial, we do not find his sentence, which includes confinement and a dismissal, is inappropriately severe as a matter of law.

---

[48] We could just as easily speculate that the members found the Government's recommendation of ten years in confinement too high for Appellant's offenses against eight victims, and determined nine years was the minimum time in confinement warranted. *See* R.C.M. 1002(f) (directing the sentencing authority to "impose punishment that is sufficient, but not greater than necessary").

**H. Motion for a New Trial – Newly Discovered Evidence**

**1. Additional Background**

Appellant, as a medical provider, was subject to the Clinic's credentialing process. While he was under investigation for the conduct at issue in his court-martial, Appellant's authority to perform medical-provider duties was held in abeyance for 30 days, then suspended. Lt Col BL, the chief of the medical staff at Spangdahlem AB and head of its credentialing function, notified Appellant of these actions. According to Lt Col BL, the next step after suspension was a quality assurance investigation (QAI). Not wanting to interfere with the ongoing criminal investigation, Lt Col BL, in coordination with the Air Force Medical Operations Agency (AFMOA), decided the QAI would involve only a review of patient records and no interviews.

A family health physician assistant stationed at Ramstein AB, Germany, Capt MA, was detailed to complete the QAI. She understood her duty was "to examine allegations that [Appellant] made inappropriate verbal comments and/or inappropriate physical contact with a patient." Capt MA testified in a post-trial hearing that although she was asked to review a minimum of ten percent of the records in a certain time frame, she "decided to review all female encounters in the entire time frame"—which was between 24 April 2017 and 5 June 2017. In her report, she found the documentation overall to be "scarce," and provided several examples. Additionally, she concluded "all 109 encounters had poorly constructed subjective assessments"—that is, the patient's stated reason for the encounter and answers to questions—and that Appellant's "decision making was scarcely ever in the [assessment and plan], leaving . . . only a diagnosis code and orders placed by the provider." She also found Appellant did not perform a pap smear during the encounter for 22 of 23 patients who were due. The QAI memorandum, dated 2 July 2018, comprised one page with an attachment of the encounters she reviewed. The QAI was not provided to trial counsel.

Appellant was sentenced on 8 November 2019. Lt Col BL testified in a post-trial hearing that after receiving a summary of the results of Appellant's court-martial, he used that summary and the QAI "to move forward from a credentialing standpoint." Lt Col BL asked Appellant's squadron commander to deliver the QAI memorandum to Appellant while she was visiting him in confinement. In his testimony on this issue, Lt Col BL explained why he did not take action on the QAI results until after the court-martial:

> [AFMOA] said, "Okay, well - you know - file it away, keep it, because that part of the process has to happen. So when the criminal investigation is done, you've now got this part at least - at least this part of it done and you can move forward whenever

they finish." And so we put it in a folder and - you know - with the knowledge, okay, his medical documentation was - you know - shoddy in some ways, but quite honestly since that wasn't the question that we were really kind of concerned about, given the nature of the allegations, we just didn't pay too much heed to it at that time. It wasn't a - it wasn't a big event to see that written. It was going to be a process we would deal with later, if and when he got back to clinical care.

Regarding discovery, Lt Col BL remembered a request "for all of [Appellant's] clinical records" but did not remember "getting an official request for peer review and such." He did not provide the QAI memorandum to Appellant, or mention it to Appellant's counsel, before the court-martial. Lt Col BL also explained that credentialing matters are generally "protected" and "not supposed to be used in a criminal finding. But the converse is not true." Lt Col BL was unable to explain the full nature of that protection.

In its notice dated 1 October 2019, the Defense provided the Government its anticipated witness list. The first of 26 names listed was Lt Col BL, whom the Defense stated "Would testify regarding the culture in the [Medical Group], complaints made at or around the same time regarding provider care." Lt Col BL was not called as a witness during Appellant's trial or sentencing.

In its pretrial discovery requests and motions, the Defense did not specifically ask for any credentialing actions, or for any QAI in particular. It did, however, request:

> Paragraph 2n: Access to, with specific direction to the location, format, and what files were used or accessed, and/or copies of any electronic files or databases used to further the investigation of this case, including but not limited to AHLTA, any medical records databases, *complaints systems*, patient advocacy systems, patient logs, patient appointment systems, etc.
>
> . . . .
>
> Paragraph 6l: Copies of any records of the Spangdahlem Air Base Clinic regarding any complaints filed against *any provider* from 2014 to present. Any formal complaints, reports to law enforcement, patient advocacy requests, requests for a different provider, *credentialing complaints*, etc. Additionally, any policies or memoranda of the Spangdahlem Air Base Clinic regarding policies on patient care, levels of care, speed of care, limits of care, etc.

(Emphasis added). In response to these requests, the Government stated:

Paragraph 2n: The Government disclosed the ROI and victim video interviews on 22 Apr 2019. On 2 and 3 Jul 2019, the Government disclosed portions of the OSI case file and we are currently tracking down additional information per this request which we will make available all records in compliance with the above stated rules, regulations, and other applicable authority. With the exception of the above, the Government denies the request until such time as the defense clarifies what specific information they are seeking and state the rule or basis in law for your entitlement.

. . . .

Paragraph 6l: The Government is currently tracking down additional information per this request which we will make available all records in compliance with the above listed rules, regulations, and other applicable authority. With the exception of the above, the Government denies the request until such time as the defense clarifies what specific information they are seeking and state the rule or basis in law for your entitlement.

The Defense did not later specify to the Government a basis for its entitlement to the requested information.

After its pretrial interview of Lt Col BL, the Government sought AFMOA assistance obtaining peer reviews of Appellant's patients' records. The AFMOA response was that because peer review records were protected by statute, the requester needed to provide information about how, when, and why the documents would be used. The Government did not make further requests for the records. The military judge found that the Government did not have reason to believe those records contained any exculpatory information. Trial counsel were not aware of the existence of the QAI until after Appellant received it— when defense counsel asked the Government whether it had provided the QAI documents in discovery.

The Defense also requested the "medical records of all patients seen by [Appellant] from 2014 to present." The Government's response was substantially the same as its response, detailed above, to the Defense's discovery request contained within "paragraph 6l." Later, the Defense narrowed its request to medical records of patients Appellant saw at Spangdahlem AB. In response, the Government provided to the Defense around 60,000 pages of patient records. Among these pages were the records of the 109 female patients that Capt MA reviewed in her QAI.

Before trial, the Defense had identified at least two potential witnesses who had performed peer reviews on Appellant's patients' records. Moreover, the defense team included experts in gynecology, cardiology, pulmonology, and forensic psychology, and an expert physician assistant.

On 6 February 2020, Appellant filed a motion to compel discovery and for appropriate relief, including a new trial. The Defense requested—and the Government did not oppose—a post-trial Article 39(a), UCMJ, hearing on its motion, which the military judge granted. Due to the parties' request for a continuance and various logistical issues, the hearing ultimately was scheduled for 17 July 2020 and a new military judge was detailed. By the time of the hearing, the Defense had received its requested discovery materials; therefore, the only outstanding issue was the Defense's request for a new trial. On 14 August 2020, after considering the pleadings, evidence, argument, and transcript of the court-martial proceedings,[49] the post-trial military judge issued a 19-page written ruling, denying the Defense's motion for a new trial.

Appellant asserts the military judge erred in his ruling by (1) considering the nondisclosure a discovery violation and not a *Brady*[50] violation; (2) finding the Defense made a general and not specific discovery request; (3) misunderstanding the resulting prejudice in the context of the lengthy trial; (4) classifying the QAI as cumulative and collateral; and (5) finding the QAI did not meet the criteria for "newly discovered evidence." We first address the implications of the Government's failure to provide the QAI to the Defense before trial, then the military judge's remedy of providing no relief upon Appellant's post-trial motion for a new trial based on newly discovered evidence.

**2. Law and Analysis**

### *a. Discovery and* **Brady**

In reviewing discovery matters, we conduct a two-step analysis: "first, we determine whether the information or evidence at issue was subject to disclosure or discovery; second, if there was nondisclosure of such information, we test the effect of that nondisclosure on the appellant's trial." *United States v. Coleman*, 72 M.J. 184, 187 (C.A.A.F. 2013) (quoting *United States v. Roberts*, 59 M.J. 323, 325 (C.A.A.F. 2004)).

"The failure of the trial counsel to disclose evidence that is favorable to the defense on the issue of guilt or sentencing violates an accused's constitutional

---

[49] The transcript of the trial was certified on 2 April 2020. The record of trial was not certified until 25 August 2020, after the post-trial hearing and the military judge's ruling.

[50] *Brady v. Maryland*, 373 U.S. 83 (1963).

right to due process." *Coleman*, 72 M.J. at 186 (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Such cases are reviewed for harmless error. *Id.* (citing *Smith v. Cain*, 565 U.S. 73, 75 (2012)). Favorable evidence includes "impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citation omitted); *see also United States v. Claxton*, 76 M.J. 356, 359 (C.A.A.F. 2017) (quoting *Strickler*, 527 U.S. at 280).

> There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler*, 527 U.S. at 281–82.

Prejudice is shown when the undisclosed evidence is material; "[s]uch evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler*, 527 U.S. at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also Coleman*, 72 M.J. at 186 (adopting this test for prejudice). A reasonable "possibility" of a different result is not sufficient. *Strickler*, 527 U.S. at 291. We evaluate prejudice from the nondisclosure "in the context of the entire record." *Turner v. United States*, ___ U.S. ___, 137 S. Ct. 1885, 1893 (2017) (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)); *see also United States v. Stone*, 40 M.J. 420, 423 (C.M.A. 1994) (noting that "recourse to *the entire record* of trial is required to determine the effect of the undisclosed evidence on the conviction"). A *Brady* violation is demonstrated "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

"A military accused also has the right to obtain favorable evidence under Article 46, UCMJ, 10 U.S.C. § 846 (2006), as implemented by R.C.M. 701–703." *Coleman*, 72 M.J. at 186–87 (footnotes omitted). The CAAF "has held that Article 46[, UCMJ,] and its implementing rules provide greater statutory discovery rights to an accused than does his constitutional right to due process." *Coleman*, 72 M.J. at 186 (citing *Roberts*, 59 M.J. at 327) (additional citation omitted). When "the defense made a specific request for the undisclosed information . . . we apply the heightened constitutional harmless beyond a reasonable doubt standard." *Id.* at 187 (citations omitted).

In this case, whether labeled a mere discovery violation or a *Brady* violation, the Government's failure to provide the QAI to the Defense before trial was error. The meaningful issue on appeal is how the military judge addressed that error. Appellant claims the military judge made erroneous conclusions

and thereby abused his discretion in denying the Defense motion for a new trial. We disagree.

The military judge first considered the nature of the violation before fashioning a remedy. Because he found the Defense did not specifically request the QAI, he analyzed the violation under a harmless-error standard. While he considered the QAI to be favorable to the Defense, he also found it immaterial, cumulative, and collateral. Additionally, he found the Government's case was strong, and that there was other evidence of sexual intent, consciousness of guilt, and plan and scheme. He concluded the Defense did not meet "their burden to show the failure to disclose the QAI create[d] a reasonable probability of a different trial result . . . ."

We agree that the Defense did not make a specific request for the QAI, and the military judge analyzed the violation under the correct standard. The Defense did not request records relating to credentialing actions against Appellant. The Defense requested "credentialing complaints, etc." filed at the Clinic against "any provider from 2014 to present" and access to "complaints systems." Perhaps because such requests were overbroad, they did not focus the Government on obtaining a document that would be used to further credentialing actions against Appellant. After the Government notified the Defense that it encountered resistance obtaining the requested information, the Defense did not reply to the Government and articulate why the information it sought should not be protected from disclosure. Neither the Defense nor the Government pursued the matter. The Defense did not request "peer reviews," which might have netted the QAI inasmuch as it was a type of peer review.[51] Trial counsel did not know about the QAI, much less hide it from the Defense.

Despite finding that the Defense made only a general request, the military judge also assumed *arguendo* that the Defense made a specific discovery request, and nevertheless found the error harmless beyond a reasonable doubt. He added to this specific analysis the fact that the Defense was in possession of the patient records reviewed in the QAI, and that other evidence would have rebutted the QAI's findings.

> [T]he main problems the Defense needed to overcome was not whether [Appellant] was good at documenting patient encounters, but if and why he performed sensitive exams when not medically necessary, in a way that was not clinically effective, and

---

[51] Before trial and after interviewing Lt Col BL, a defense witness, the Government sought more information about peer reviews—a different category from credentialing actions—but did not pursue them until responding to the Defense's post-trial motion.

under circumstances that were counter to any provider with a minimal level of competence. . . .

. . . Ultimately, the argument that [Appellant] demonstrated poor documentation practices would only have carried the Defense theory so far. The members would still have to disregard strong evidence that [Appellant] performed unnecessary sensitive exams under suspicious circumstances notwithstanding the documentation, in order to find a reasonable doubt existed as to [Appellant's] actions and intentions.

The military judge concluded that the "nondisclosure of the QAI memorandum, its attachments, and related documentation would not have affected the outcome of the trial and is harmless beyond a reasonable doubt." While not dispositive, we agree with the military judge that the Defense did not specifically request the QAI, but even if it had, the Government's failure to provide it to the Defense in pretrial discovery was harmless beyond a reasonable doubt. With this backdrop of the nature of the discovery violation, the military judge considered the requested remedy of a new trial—which we now review.

### b. Motion for a new trial

A military judge decides a post-trial motion for a rehearing by applying the criteria for petition for a new trial set forth in Article 73, UCMJ, 10 U.S.C. § 873, and R.C.M. 1210(f). *United States v. Williams*, 37 M.J. 352, 355–56 (C.M.A. 1993) (citation omitted). We review such rulings for an abuse of discretion. *Id.* at 356 (citations omitted).

A military judge abuses her discretion when her findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law.

*United States v. Webb*, 66 M.J. 89, 93 (C.A.A.F. 2008) (citations omitted). We also review a military judge's selection of a remedy for an abuse of discretion. *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004).

A petitioner may petition for a new trial "on the grounds of newly discovered evidence or fraud on the court." Article 73, UCMJ, 10 U.S.C. § 873. A new trial shall not be granted on the grounds of newly discovered evidence unless the petition shows that:

(A) The evidence was discovered after the trial;

(B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and

> (C) The newly discovered evidence, if considered by a court-mar-
> tial in the light of all other pertinent evidence, would probably
> produce a substantially more favorable result for the accused.

R.C.M. 1210(f)(2); *see United States v. Luke*, 69 M.J. 309, 314 (C.A.A.F. 2011); *United States v. Johnson*, 61 M.J. 195, 198 (C.A.A.F. 2005). "No fraud on the court-martial warrants a new trial unless it had a substantial contributing effect on a finding of guilty or the sentence adjudged." R.C.M. 1210(f)(3). Examples of fraud on a court-martial which may warrant granting a new trial include "confessed or proved perjury . . . which clearly had a substantial contributing effect on a finding of guilty" and "willful concealment by the prosecution from the defense of evidence favorable to the defense which . . . would probably have resulted in a finding of not guilty . . . ." R.C.M. 1210(f)(3), Discussion.

The CAAF repeatedly has found that "'requests for a new trial . . . are generally disfavored,' and are 'granted only if a manifest injustice would result absent a new trial . . . based on proffered newly discovered evidence.'" *United States v. Hull*, 70 M.J. 145, 152 (C.A.A.F. 2011) (quoting *Williams*, 37 M.J. at 356); *see also Johnson*, 61 M.J. at 199.

The military judge found Appellant did not satisfy all three prongs for a new trial premised on newly discovered evidence under Article 73, UCMJ. Certainly, the QAI was not discovered until after trial. Regarding the discoverability, however, the military judge considered the QAI another form of peer review which could have been discovered by the Defense prior to or during trial. We find no error in his conclusion. The Defense had access to several personnel who would be familiar with the Air Force credentialing processes, including Lt Col BL. Moreover, Appellant knew that his medical-provider privileges were first in abeyance, then suspended. And even if the military judge erred in finding the QAI was cumulative and collateral, those findings did not significantly impact his other conclusions. Most importantly, however, based on essentially the same reasons as to why he determined the nondisclosure was harmless beyond a reasonable doubt, the military judge found "the QAI memorandum, considered in light of all the other pertinent evidence, would not have produced a substantially more favorable result for [Appellant] in this case." We find the military judge did not abuse his discretion in denying the Defense motion for a new trial.

The QAI memorandum contained the findings, conclusions, and recommendations of Appellant's peer; it reflected one medical provider's opinion. The Defense had access to the same records considered in the QAI, and had five medical experts who could perform their own review of those records. Moreover, as experts, they would have been able to testify about any opinion they formed after conducting such review.

Appellant suggests the post-trial military judge did not "grasp[ ] the full nature of the trial," especially the importance of the evidence regarding Appellant's documentation. He asserts that records introduced as a prosecution exhibit[52] indicating that Appellant's recordkeeping ability was "superior" stood unrebutted, and "thus the failure to document suggested devious intent." We agree with the conclusion of the military judge that at trial "relatively little emphasis" was placed on these records, and with his overall analysis of the exhibit:

> The documentation alone was not evidence of sexual gratification or intent, or evidence of a guilty conscious [sic] or plan and scheme, it was part of a larger picture in which the Government tried to prove [Appellant] used his knowledge of the [C]linic procedures to perform unnecessary sensitive exams on certain female patients under circumstances in which his actions were not likely to be discovered.

While several witnesses testified at trial about Appellant's documentation of the victim-patient encounters, no witness testified about his proficiency at documenting all patient encounters. In closing, the Government argued this "selective documenting" along with "selective chaperone" indicated "an effort to create an opportunity to act on [ ] sexual intent." Again, we agree with the post-trial military judge's conclusion:

> The QAI evidence of poor documentation may have supported the defense argument of ineptitude, but in the face of the testimony of expert witnesses that the sensitive exams performed by [Appellant] on named victims were not medically necessary, [Appellant's] actual behavior with patients (i.e., nature of touchings, failure to ask for consent, asking patients to remov[e] undergarments, unbuttoning the pants of a patient, running his fingers through pubic hair, etc.), and [Appellant's] selective use of the chaperone policy, the QAI memorandum is not so compelling that a factfinder would disregard all the other evidence.

---

[52] Prosecution Exhibit 22 was comprised of three documents, each an Air Force Form 1562, *Credentials Evaluation of Health Care Practitioners*. The form covering May 2011 to September 2012, while Appellant was a student, indicates Appellant was "superior" in 12 areas, including "record keeping," but "good" in "competence and skill" and "case presentations." The form covering the period from June 2011 to July 2015 indicates Appellant was "superior" in all 14 areas. Another form, covering only April 2015 to June 2015, indicates Appellant's "record keeping" and performance in five other areas were "not observed."

We conclude that providing the members with the QAI—either the document or the testimony of its author—would not have moved the scales in favor of Appellant. We agree with the military judge that had the Defense received Capt MA's QAI memorandum beforehand, it would not have affected the outcome of Appellant's trial.

## I. Timeliness of Appellate Review

### 1. Law

Whether an appellant has been deprived of his due process right to speedy post-trial and appellate review, and whether constitutional error is harmless beyond a reasonable doubt, are questions of law we review de novo. *United States v. Arriaga*, 70 M.J. 51, 55 (C.A.A.F. 2011) (citing *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006)).

In *Moreno*, the CAAF established a presumption of facially unreasonable delay when the convening authority does not take action within 120 days of sentencing, when a case is not docketed with the CCA within 30 days of convening authority action, or when the CCA does not render a decision within 18 months of docketing. 63 M.J. at 142. In *United States v. Livak*, this court established an aggregated sentencing-to-docketing 150-day threshold for facially unreasonable delay for cases referred to trial on or after 1 January 2019. 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020) (deducing aggregate standard from standards announced by our superior court in *Moreno*).

If there is a *Moreno*-based presumption of unreasonable delay or an otherwise facially unreasonable delay, we examine the claim under the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citations omitted). In *Moreno*, the CAAF identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of a convicted person's grounds for appeal and ability to present a defense at a rehearing. *Id.* at 138–39 (citations omitted).

"We analyze each factor and make a determination as to whether that factor favors the Government or the appellant." *Id.* at 136 (citation omitted). Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id.* (citing *Barker*, 407 U.S. at 533). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* (citation omitted). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Recognizing our authority under Article 66(d), UCMJ, we also consider if relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 223–24 (C.A.A.F. 2002).

**2. Additional Background and Analysis**

Appellant was sentenced on 8 November 2019. The post-trial Article 39(a), UCMJ, hearing on the Defense's motion concluded on 17 July 2020, and the military judge issued his ruling on the post-trial motion on 14 August 2020. The military judge signed the entry of judgment on 24 August 2020 and the record of trial was certified the next day. Appellant's case was docketed with the court on 15 October 2020.

Applying *Livak*, we find a facially unreasonable delay in the docketing with this court; and applying *Moreno*, we find a facially unreasonable delay in this court issuing its opinion in Appellant's case more than 18 months after the case was docketed with the court. However, we determine no violation of Appellant's rights to due process and a speedy appellate review. The reasons for the delays include the post-trial hearing to decide Appellant's motion for a new trial, as well as the time required for Appellant to file his brief, which he did on 6 January 2022—over 14 months after his case was docketed with the court. The Government submitted its answer on 11 February 2022, and Appellant replied to the answer on 27 February 2022. The delay became facially unreasonable on approximately 15 April 2022.

Analyzing the *Barker* factors, we find both delays are long, though not excessively so. Appellant filed his post-trial motion three months after his sentence was announced, and it took six months for the military judge to hold the hearing and issue his ruling. The length of the delay in the court issuing this opinion is partially owing to 12 defense-requested enlargements of time that the court granted before the case was joined, plus one enlargement for the Defense to file its reply brief. After Appellant's eighth request for enlargement of time, and in each request thereafter, his counsel averred that Appellant had been specifically informed of his right to timely appellate review, was consulted with regard to the motion, and agreed with this court granting the enlargement. Counsel for both parties requested to exceed the page limit for their briefs, which requests were granted. Relevant too, on 29 April 2022, the court granted Appellant's 19 April 2022 motion for leave to file a supplemental assignment of error brief and denied his motion to cite supplemental authority; then granted Appellant's second motion to cite supplemental authority, dated 6 July 2022. The record of trial comprises 14 volumes, including 2,113 transcript pages, 29 prosecution exhibits, 5 defense exhibits, 6 court exhibits, and 152 appellate exhibits. Appellant raised 12 assignments of error—many with

multiple sub-issues—all of which this court carefully considered, and that contributed to the length of appellate delay and this opinion.

Appellant has not asserted his right to speedy appellate review or pointed to any particular prejudice resulting from the presumptively unreasonable delay, and we find none. Finding no *Barker* prejudice, we also find the delay is not so egregious that it would "adversely affect the public's perception of the fairness and integrity of the military justice system." *See Toohey*, 63 M.J. at 362. As a result, there is no due process violation. *See id.*

We determine Appellant is not due relief even in the absence of a due process violation. *See Tardif*, 57 M.J. at 223–24. Applying the factors articulated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we find the delays in post-trial and appellate review justified and relief for Appellant is not warranted.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.[53]

FOR THE COURT

FLEMING E. KEEFE, Capt, USAF
Acting Clerk of the Court

---

[53] The Statement of Trial Results failed to include the command that convened the court-martial as required by R.C.M. 1101(a)(3). Appellant asserts no prejudice and we find none. *See United States v. Moody-Neukom*, No. ACM S32594, 2019 CCA LEXIS 521, at *2–3 (A.F. Ct. Crim. App. 16 Dec. 2019) (unpub. op.) (per curiam).